In the Supreme Court of Georgia

Decided: April 5, 2021

S20Y1501. IN THE MATTER OF EDWARD SHUFF COOK.

PER CURIAM.

This disciplinary matter, which began with the filing of a grievance in October 2012, is before this Court on the Report and Recommendation of the State Disciplinary Review Board,[1] which recommends that Respondent Edward Shuff Cook (State Bar No.

---

[1] On January 12, 2018, this Court entered an order amending Part IV of the Rules and Regulations for the Organization and Government of the State Bar of Georgia ("Bar Rules"), including Bar Rule 4-102 (d), which contains the Georgia Rules of Professional Conduct. The January 12 order said that "these amendments shall be effective as of July 1, 2018 and shall apply to disciplinary proceedings commenced on or after that date," except for the amendments to Bar Rules 4-201 (b) and 4-201.1 (b) concerning the composition of the State Disciplinary Board and the State Disciplinary Review Board, which the order then addressed separately. The order also said that "the former rules shall continue to apply to disciplinary proceedings commenced before July 1, 2018" — such as this one — "provided that, after July 1, 2018, the State Disciplinary Board shall perform the functions and exercise the powers of the Investigative Panel under the former rules, and the State Disciplinary Review Board shall perform the functions and exercise the powers of the Review Panel under the former rules."

183741) be suspended from the practice of law for two years as discipline for his violations of various Rules of Professional Conduct. After considering the extensive record and the parties' exceptions to the Review Board's report and recommendation, this Court finds that a public reprimand is a sufficient sanction given the specific circumstances of this case.

This matter arose from a grievance filed by one or both of Cook's former law partners in the midst of the dissolution of their partnership. After an investigation, the Bar filed a formal complaint charging Cook with a variety of Rules violations, but it later amended its formal complaint to leave only the allegations that Cook's handling of the firm's trust account and his responses to this disciplinary matter violated Rules 1.15 (I) (a), l.15 (II) (a) and (b), and 8.4 (a) (4), as set out in Bar Rule 4-102 (d). Ultimately, Cook stipulated that he violated Rules 1.15 (I) (a) and (II) (a) and (b),[2] but

[2] He also twice petitioned for voluntary discipline based on his admission that he had violated those two Rules, but the Bar objected, and the special master rejected his petitions in favor of hearing the Bar's full presentation of evidence in the case.

2

denied that he had done so knowingly or that he violated Rule 8.4 (a) (4). After extensive hearings, special master Bryan Downs made factual findings; concluded that Cook violated Rules 1.15 (I) (a) and Rules 1.15 (II) (a) and (b), but not Rule 8.4 (a) (4); and found, in the light of a number of mitigating factors, that a one-year suspension was the appropriate punishment. After considering the exceptions filed by both parties, see former Bar Rule 4-217 (d), the Review Board disagreed with some of the special master's factual findings underlying the conclusion that Cook had not violated Rule 8.4 (a) (4). The Review Board substituted its own different factual findings on that point and concluded that Cook had violated Rule 8.4 (a) (4) in addition to his stipulated violations of Rules 1.15 (I) and (II). The Review Board concluded that Cook should face a two-year suspension for his violations.

1. *Under the Bar Rules controlling this case, we are to defer to the special master's factual findings.*

This Court generally defers to the factual findings made below where they are supported by the record. But in this case, the Court

3

is presented with conflicting sets of factual findings. Before setting out the facts of this case, we must decide whether we should defer to the factual findings made by the Review Board or to those made by the special master. A review of the applicable rules and case law shows that we are to defer to the special master's findings.

We have often cited *In the Matter of Morse*, 265 Ga. 353 (1) (456 SE2d 52) (1995), for the proposition that we are "bound by the [R]eview [Board]'s findings of fact when there is 'any evidence' to support them." Id. at 353. But *Morse* relied on the then-controlling Bar Rule 4-219 (a), which provided in part that "[f]indings of fact by the Review Panel shall be conclusive if supported by any evidence." In 1997, the Bar Rules were amended and the language relied upon in *Morse* was removed from Bar Rule 4-219 (a). After the amendments of 1997, the Bar Rules continued to allow for the Review Panel to make its own factual findings "based on the record," but they did not speak to what deference this Court was to afford those findings, particularly when they conflicted with the factual

4

findings made by a special master.[3] See former Bar Rule 4-218 (a) (the special master's findings of fact and conclusions of law "shall not be binding on the Panel and may be reversed by it on the basis of the record submitted to the Panel"). Under former Bar Rule 4-218 (a) (which applies in this case), we have held that we defer to factual findings made by the special master when they conflict with those made by the Review Board, noting that the special master "was in a best position to observe the parties' demeanor and credibility." *In the Matter of Ballew*, 287 Ga. 371, 376 (695 SE2d 573) (2010). As *Ballew* involved the same operative Bar Rules that apply to this case, *Ballew* teaches that we generally defer to the special master's factual findings if there is a conflict.

2. *The special master's findings and recommendations.*

The special master found that Cook, who has been a member of the Bar since 1993, was a partner in the law firm Cook, Hall &

_____

[3] The current Bar Rules specifically limit the Review Board's ability to set aside a special master's factual findings to cases in which the Review Board finds them to be clearly erroneous or manifestly in error. See Bar Rule 4-216 (a). That new Rule, however, applies only to cases initiated after July 1, 2018 and so does not apply here.

Lampros, LLP ("CHL"), a three-partner plaintiff's personal injury firm, which formed in early 2004 and dissolved in August 2012. Within CHL, Cook was the managing partner and the principal originator of business, while Christopher Hall and Andrew Lampros (the other two partners in the firm) were the principal litigators for the firm. A large part of CHL's practice was personal injury cases against railroads, in part because Cook had prior long-standing relationships with a number of labor organizations and was one of the railroad union's designated attorneys for representing union members in cases against railroads.

Although all three partners of CHL had signature authority on the firm's bank accounts and access to the firm's financial books and records (and, for that matter, a fiduciary duty under the Bar Rules), Cook was the partner primarily responsible for managing the firm's cash flow and bank accounts. Cook's oversight of those accounts was lax at best, as he mainly just reviewed the monthly trust account reconciliation reports produced with the firm's QuickBooks software and periodically made "sure that there . . . were funds in the

6

account." Indeed, Cook admitted that he did not keep up with the amounts held in trust for particular clients and that the firm kept no ledger or other discrete bookkeeping of any specific client's trust account activity so as to reflect at all times the exact balance held for each client, although those amounts could be calculated from the information the firm maintained.

When CHL settled a case, Cook's assistant, who performed various administrative and paralegal duties for the firm, gathered receipts and invoices from the firm's attorneys and prepared a settlement statement, which showed the calculation leading to the net amount of settlement funds due to the client after reduction for CHL's fees and expenses and amounts due to third parties. At the same time, Cook's assistant would prepare the checks necessary to pay (or reimburse the firm for) the identified expenses and to transfer earned fees from the trust account to the firm's operating account. When the settlement check "cleared" into the firm's trust account, Cook's assistant would disburse the checks. Although most settlement checks came in within a week of the settlement,

7

sometimes there was a delay while the firm waited on certain expenses to post or for a Medicare issue or some other matter to be resolved. Both Cook and his assistant claim to have understood that the checks could not be sent or the disbursements made out of the trust account until after the funds were received into the trust account, but sometimes Cook would sign the checks as soon as his assistant prepared them, purportedly with the understanding that those checks were to be held until the appropriate time. In addition, during 2010, CHL was required to hold in trust large portions of the settlement funds received in the cases of three separate clients to await the resolution of certain liens or other third-party claims. The aggregate amount of those funds varied over time, but from January 1, 2011 until August 15, 2012, that minimum required balance was never less than $571,568.

In 2012, the CHL partners became aware that significant discrepancies existed in the trust account and that the trust account held less than the minimum required balance. A series of meetings between the partners ensued, the relevant results of which were

8

that the trust account apparently was made whole through contributions from Cook and the other partners without any client losing money or suffering actual harm; the partners then became embroiled in a civil lawsuit against each other and undertook to dissolve the partnership. The two other CHL partners filed the underlying grievance against Cook and formed a new firm.[4]

A subsequent investigation revealed that, in the several years prior to the summer of 2012, on dozens of occasions, checks were negotiated early such that funds were prematurely transferred from the CHL trust account to the firm's operating account before the clients' settlement proceeds had been received. As a general proposition, all three partners benefitted from these premature transfers since the monies went into the firm's operating account to

---

[4] According to the testimony before the special master, after CHL dissolved in 2012, Cook opened his own law firm and adopted a different method of bookkeeping to ensure that the trust account issues would never happen again. He testified that he now employs not only a bookkeeper, but also a CPA, both of whom oversee his books. In addition, Cook now keeps track of each client's individual trust account balance as required by the Bar Rules. Cook has practiced in this manner since 2012 without any reported incidents or complaints.

run the firm and to compensate the partners. Further, a review of the bank balance for CHL's trust account during that same time frame revealed numerous instances where the trust account balance was less than the minimum required balance, often much less and sometimes for weeks at a time. The special master found —  and Cook stipulated — that this conduct constituted multiple violations of Rules 1.15 (I) (a) and 1.15 (II) (a) and (b), the maximum penalty for which is disbarment.

As mentioned above, the Bar also charged that Cook violated Bar Rule 8.4 (a) (4) because, in its view, his handling of the trust account was inherently dishonest and deceitful and he made false statements about his knowledge of the situation and his actions during the course of this disciplinary proceeding. As to this issue, the special master agreed that some of Cook's answers to questions under oath were evasive or inconsistent with other evidence, but he nevertheless concluded that the evidence did not clearly and convincingly show dishonesty or deceit. Although the Review Board saw the evidence differently, we defer to the special master's finding,

which leads us to conclude, as did the special master, that Cook did not violate Rule 8.4 (a) (4).

Having thus found violations only of Rules 1.15 (I) (a) and (II) (a) and (b), the special master turned his attention to the appropriate level of discipline. He correctly noted that this Court generally looks to the ABA's Standards for Imposing Lawyer Sanctions for guidance in determining punishment in disciplinary cases, and that ABA Standard 3.0 provides for consideration of the following factors in imposing discipline: the duty violated; the lawyer's mental state; the actual or potential injury caused by the lawyer's misconduct; and the existence of aggravating or mitigating factors. Noting that Rules 1.15 (I) and (II) involve the duty to safeguard property, the special master considered Cook's mental state. The special master considered the record evidence as a whole, including the timing of the disbursements — which often came when the balance of the firm's operating account was dangerously low (or even negative) — and found that it clearly and convincingly established that Cook knew or should have known about the issues

in the trust account. With regard to the issue of injury or potential injury, the special master found that no client was actually harmed because they all ultimately received their settlement proceeds on a timely basis. He concluded, however, and we agree, that the potential for injury created by Cook's mismanagement of the trust account was substantial as the aggregate amount of money prematurely removed from the trust account was large and the trust account's balance was repeatedly depleted well beyond the amounts that should have been held in trust for disputed contingencies related to client matters.[5]

The special master noted that ABA Standard 4.12 generally approves suspension when a lawyer knows or should know that he is dealing improperly with client property and causes a client injury or potential injury. He then considered factors in mitigation and aggravation of that discipline. In mitigation, the special master

---

[5] Any premature withdrawal from an attorney's trust account is serious, and the raw number of premature withdrawals in this case appears particularly egregious. But given the amount of activity in the CHL trust account during the relevant time frame, it appears that the vast majority of the transfers were made in a proper and timely manner.

noted that Cook had no prior disciplinary history, see ABA Standard 9.32 (a); and that Cook presented testimony from many of his peers to the effect that he is a person of good character who enjoys an excellent reputation in the legal community, is passionate about and dedicated to his clients, and would never steal from his clients, see ABA Standard 9.32 (g). The special master noted that Cook suffered serious personal issues during the first seven months of 2012, in that his wife suffered medical issues requiring her to spend a significant amount of time at the Cleveland Clinic in Ohio and ultimately leading to open heart surgery, see ABA Standard 9.32 (c). The special master also found that Cook made a good faith effort at making restitution and rectifying the consequences of his misconduct by contributing substantially to restoring the trust account before any client suffered losses, see ABA Standard 9.32 (d), but he found this factor discounted somewhat because the effort to make restitution was not necessarily timely; because it was made only after the other CHL partners confronted him in the late summer of 2012; and because his partners also contributed to the

13

restoration of the trust account balance. The special master further found that, although Cook expressed remorse, see ABA Standard 9.32 (l), and testified that he understood why the early withdrawals from the trust account were improper, his attitude during these disciplinary proceeds reflected an unwillingness to appreciate the seriousness of his misconduct or the obligations an attorney has as a fiduciary of clients' funds.

The special master addressed another proposed mitigating factor submitted by Cook, namely, that his discipline should be mitigated somewhat because Hall and Lampros — who were also lawyers and partners in the firm, who had duties to CHL's clients and others, and who therefore shared the obligation to monitor CHL's trust account — wholly abdicated their responsibility in that regard during the relevant time, and yet have not been pursued by the Bar for their failures. The special master found the Bar's seeming indifference to the other partners' complicity and its decision to single out Cook for discipline troubling, particularly where the underlying grievance was filed not by clients or injured

third parties, but by those same former law partners. The special master noted that Cook would lose his status as "designated counsel" for the railroad union if suspended, that Cook losing this status would be tantamount to disbarment given that the substantial majority of his practice was representing railroad workers in injury cases, and that his former law partners, who practice in the same area of specialty as Cook, had a pecuniary interest that would benefit from any discipline imposed on Cook. Noting that the logical consequence of such uneven treatment by the Bar would be the erosion, among members of the Bar, of the principle that law firm partners have a shared responsibility for the firm's trust account, he considered these circumstances to be mitigating.

In aggravation, the special master found that, by virtue of the repeated instances of mismanagement of the trust account as shown in this case, there was both a pattern of misconduct, see ABA Standard 9.22 (c), and multiple offenses, see ABA Standard 9.22 (d). He also found that Cook had substantial experience in the practice

15

of law, see ABA Standard 9.22 (i), but concluded that the record did not show by clear and convincing evidence that Cook acted with a dishonest or selfish motive, see ABA Standard 9.22 (b). Based on that record, the special master concluded that a one-year suspension was the most appropriate discipline for Cook's actions.

The Review Board took a different view of the evidence and found a violation of Rule 8.4 (a) (4)[6] in addition to Rules 1.15 (I) and (II). It also took a different view of the mitigating and aggravating factors and, ultimately, recommended that Cook be suspended for two years. Both Cook and the Bar filed exceptions to the Review Board's report and recommendation.

3. *Our review of the case.*

We have reviewed the record in this case, including Cook's stipulation that he repeatedly violated Rules 1.15 (I) (a) and 1.15 (II) (a) and (b) and the testimony and documents presented at the lengthy evidentiary hearing. As in *Ballew,* the special master "was

---

[6] The Review Board technically concluded that Cook violated a different sub-section of Bar Rule 8.4 (a), but, taking its report as a whole, it is clear that it meant to find a violation of Rule 8.4 (a) (4).

in the best position to observe the parties' demeanor and credibility." 287 Ga. at 376. We therefore accept the special master's conclusions that Cook did not act with an intention to deceive and that the record does not contain clear and convincing evidence that Cook violated Rule 8.4 (a) (4). See *In the Matter of Woodham*, 296 Ga. 618, 625 (3) (769 SE2d 353) (2015) (concluding that attorney did not violate Rule 8.4 (a) (4) where his conduct did not show evidence that he misled or attempted to mislead others). We must next determine the appropriate discipline to be imposed on Cook for his stipulated violations of Rules 1.15 (I) and (II).

(a)    *The appropriate level of discipline under the totality of the circumstances is a public reprimand.*

The primary purpose of a disciplinary action is to protect the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct, but this Court is also concerned with the public's confidence in the profession generally. See *In the Matter of Ortman*, 289 Ga. 130, 130-131 (709 SE2d 784) (2011). The sanction imposed for disciplinary infractions

17

should be sufficient to penalize the offender for his wrongdoing, to deter other attorneys from engaging in similar behavior, and to indicate to the general public that the courts will maintain the ethics of the profession. See *In the Matter of Dowdy*, 247 Ga. 488, 493 (4) (277 SE2d 36) (1981). Although the ABA standards are generally instructive as to the question of punishment, see *In the Matter of Noriega-Allen*, 308 Ga. 398, 399 (841 SE2d 1) (2020), they are not controlling. Instead, the level of punishment imposed rests in the sound discretion of this Court. See *Dowdy*, 247 Ga. at 493 (4).

Here, we note that the evidence did not prove that Cook acted dishonestly, intentionally, or maliciously, and, although the potential for harm was undeniably great, it appears that no client or third party suffered any actual harm as a result of the violations — as no client or third party ever suffered any delay in obtaining the funds owed to him or her. Moreover, this is Cook's first disciplinary infraction in what appears to have been a long and distinguished legal career, and, during the many years since these infractions, Cook has taken steps to prevent any additional issues of this nature.

Further, the record contains no evidence, or even an allegation, that Cook failed to adequately or competently represent a client. Although we wish to emphasize the seriousness of Cook's misconduct and the non-delegable obligation he has as a fiduciary of his clients' property, given the special considerations discussed above, this Court concludes that the mitigating factors present in this case — which do not include the Bar's disparate treatment of Cook compared to his former partners — outweigh the aggravating factors of multiple violations and substantial experience in the practice of law such that a suspension is not warranted.

Although violations of Rule 1.15 are always serious, we have accepted a reprimand as an appropriate sanction in similar cases involving that rule. See, e.g., *In the Matter of Brock*, 306 Ga. 388 (830 SE2d 736) (2019) (imposing Review Board reprimand for multiple violations of Rules 1.15 and 5.3); *In the Matter of Ralston*, 300 Ga. 416 (794 SE2d 646) (2016) (imposing Review Panel reprimand for violations of Rules 1.15 and 1.8); *In the Matter of Brown*, 297 Ga. 865, 865 (778 SE2d 790) (2015) (imposing a public

reprimand for multiple violations of the Rules of Professional Conduct, including trust account violations); *In the Matter of Francis*, 297 Ga. 282 (773 SE2d 280) (2015) (imposing a Review Panel reprimand where attorney commingled personal and fiduciary funds, and had a prior disciplinary history); *In the Matter of Howard*, 292 Ga. 413 (738 SE2d 89) (2013) (imposing public reprimand where attorney admitted violations of trust account rules, but no actual harm was done to clients); *In the Matter of Grant*, 287 Ga. 131 (694 SE2d 647) (2010) (imposing a Review Panel reprimand when attorney's poor supervision permitted paralegal to steal client funds and attorney mismanaged other client funds). Compare *In the Matter of Butler*, 283 Ga. 250 (657 SE2d 245) (2008) (disbarment for violations of Rules 1.15 (I) and (II), 8.1, and 8.4 (a) (4) with respect to attorney's conversion of one client's funds for personal use, in the light of numerous aggravating factors, including an indifference to making restitution); *In the Matter of Wright*, 294 Ga. 289 (751 SE2d 817) (2013) (one-year suspension for intentional violation of Rule 1.15 and other rules where client was harmed and lawyer engaged

in dishonesty; reinstatement conditioned on repayment of client and other things); *Dowdy*, 247 Ga. at 494 (4) (indefinite suspension imposed for violations of trust account rules, which resulted in client failing to receive funds owed to her in a timely manner). Although we acknowledge that there is precedential support both for a reprimand and for a suspension, based on the facts of this case and the mitigating factors, we believe that the appropriate punishment is a public reprimand. Accordingly, we order that Cook receive a public reprimand in accordance with Bar Rules 4-102 (b) (3) and 4-220 (c) as punishment for his violations of Rules 1.15 (I) (a) and 1.15 (II) (a) and (b).[7]

(b)    *Some members of the Court have additional concerns.*

Some members of this Court consider it necessary to address concerns raised by the special master. Like him, some of us are

---

[7] The dissent reads our precedents as suggesting a stronger sanction, and also relies on the ABA Standards in arriving at that conclusion. But the kind of discretion that we exercise in selecting a sanction in disciplinary cases is not so limited. The ABA Standards are instructive, not binding, and while we try generally to treat like cases alike, none of our precedents has exactly the same facts as any other.

21

concerned about the manner in which this disciplinary matter arose and the seemingly unequal manner in which it has been prosecuted. As noted above, this grievance was filed not by any client of CHL, but by one or both of Cook's former law partners at a time when CHL was dissolving and their new firm stood to benefit from any discipline imposed upon Cook. In addition, this case includes no proof that Cook benefited uniquely from the premature transfers; instead, it appears that the benefits flowed to all of the CHL partners. Under the Bar Rules, Cook's partners bore responsibility, along with Cook, for the trust account and for the safekeeping of their clients' funds and other property.

Yet the Bar chose not to exercise its authority to initiate an investigation into the actions of either of Cook's partners, explaining to this Court that Cook never filed a grievance against those partners, and that, if he had believed they were complicit, he could have done so. The Bar further argues that factors like motivation behind the grievance and uneven treatment should not be

considered in mitigation because the ABA Standards do not separately recognize them as mitigating factors.

Regardless of whether we should consider these as mitigating factors, the Bar had the authority to initiate investigations of attorney misconduct on its own without waiting for a grievance to be filed. See former Bar Rule 4-203 (a) (2) (discussing power of Investigative Panel of the State Disciplinary Board prior to July 1, 2018 to initiate grievances against attorneys). The Bar has not offered any explanation of why it did not exercise its authority to investigate the other law firm partners, and its failure to do so could be seen as lowering the standards imposed on law partners who are not specifically tasked with managing their firm's trust account. And such failure could encourage lawyers to use the Bar's disciplinary process to resolve internal law firm disputes and settle old scores with former partners. Such weaponization of the disciplinary process must not be encouraged.

*All the Justices concur, except Melton, C. J., and Nahmias, P. J., who dissent.*

23

NAHMIAS, Presiding Justice, dissenting.

I agree with much of what is said in the majority opinion, but I do not agree that a mere reprimand is the appropriate sanction for Cook's repeated and serious violations of his obligation to safeguard his clients' funds. Some details not discussed in the majority opinion reveal the extent of Cook's improper conduct.

The Special Master found that

> [b]etween November 2009 and August 2012, there were 45 instances in which Cook signed a trust account check payable to [his law firm] CHL for attorney fees earned or litigation expenses incurred, which was deposited into the CHL operating account *before* corresponding settlement funds were received and deposited into the CHL trust account. One such instance occurred in 2009, 13 in 2010, 18 in 2011, and 13 in the eight and a half months of 2012 before the firm broke up. The 45 checks related to 20 different client settlements. The aggregate dollar amount of those improper, premature disbursements was $1,776,868.07.

(Emphasis in original.) Thus, the scope of these violations of Rules 1.15 (I) (a) and (II) (a) and (b) was extensive – dozens of separate violations over nearly three years affecting 20 clients' settlements

and putting an enormous amount of those clients' funds at risk.[8]

Although, fortunately, no client actually lost money, the law firm was in essence borrowing funds that were supposed to be held in trust, sometimes for days, sometimes for weeks, and sometimes for

---

[8] It is worth a reminder of what these rules of professional conduct require of all Georgia lawyers. Rule 1.15 (I) (a) says:

> A lawyer shall hold funds or other property of clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own funds or other property. Funds shall be kept in one or more separate accounts maintained in an approved institution as defined by Rule 1.15 (III) (c) (1). Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation.

And Rule 1.15 (II) (a) and (b) says in pertinent part:

> (a) Every lawyer who practices law in Georgia, . . . and who receives money or property on behalf of a client or in any other fiduciary capacity, shall maintain or have available one or more trust accounts as required by these Rules. All funds held by a lawyer for a client and all funds held by a lawyer in any other fiduciary capacity shall be deposited in and administered from a trust account.

> (b) No personal funds shall ever be deposited in a lawyer's trust account, except that unearned lawyer's fees may be so held until the same are earned. . . . Records on such trust accounts shall be so kept and maintained as to reflect at all times the exact balance held for each client or third person. No funds shall be withdrawn from such trust accounts for the personal use of the lawyer maintaining the account except earned lawyer's fees debited against the account of a specific client and recorded as such.

25

months.

Moreover, as to the three large settlements that the majority opinion mentions, which were required to be held in trust pending the resolution of disputed and then-uncertain third-party claims, at least $571,568 was supposed to be held between January 1, 2011 and August 15, 2012. But the balance in the CHL trust account often dropped below that level, sometimes far below and sometimes for months at a time. In July 2012, the trust account balance dropped to just $288.82 (making the account short by more than half a million dollars), and a check written in January 2012 to one claimant for more than $288,700 fortunately was not negotiated by that claimant for more than six months, as the trust fund balance often had insufficient funds to cover the check during that period. And while the Special Master found that the State Bar had not shown by clear and convincing evidence that Cook engaged in dishonest or deceitful conduct with regard to the trust account or the disciplinary proceedings and thus that he did not violate Rule 8.4 (a)

(4)[9] as the Bar had alleged, the evidence did establish that Cook knew or should have known that funds held in trust were occasionally disbursed before they should have been.

When the scope of Cook's misconduct is detailed, it becomes clear that none of the trust-account cases imposing reprimands that the majority opinion cites as "similar" to this case really are similar in terms of the extent of the violations or the amount of client funds put at risk.[10] Moreover, the majority opinion ignores numerous

---

[9] Rule 8.4 (a) (4) says that a lawyer shall not "engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation."

[10] The majority opinion cites these reprimand cases: *In the Matter of Brock*, 306 Ga. 388, 388-390 (830 SE2d 736) (2019) (imposing a Review Board reprimand for a violation of Rules 1.15 and 5.3 where the lawyer was unaware of his paralegal's theft of about $21,000 from his clients' trust account funds; the lawyer did not keep records of the account balance for each of his clients; he made one student loan payment from earned attorney fees improperly retained in the trust account and two mortgage payments from the account on behalf of a former client, whose funds the lawyer had failed to promptly deliver; and several mitigating factors were present); *In the Matter of Ralston*, 300 Ga. 416, 416-418 (794 SE2d 646) (2016) (holding that a Review Panel reprimand was the appropriate sanction for a lawyer's violation of Rules 1.15 and 1.8 where he used earned but undisbursed fees in his trust account to provide his clients with a no-interest loan through 12 disbursements totaling $22,000 and several mitigating factors were present); *In the Matter of Brown*, 297 Ga. 865, 865-867 (778 SE2d 790) (2015) (imposing a public reprimand with conditions for a violation of Rule 1.15 and other rules where the lawyer failed, among other things, to hold in her trust account funds generated by the sale of property during her client's divorce proceeding, although the lawyer did keep

27

attorney discipline cases in which violations of Rule 1.15 – even with

no actual harm to clients, no major aggravating factors like lying to

the funds segregated from her own funds; delayed distributing a share of those funds to the client's ex-husband to protect her client; disbursed the funds from her trust account using money she had deposited there from earned legal fees; and several mitigating factors were present); *In the Matter of Francis*, 297 Ga. 282, 282-283 (773 SE2d 280) (2015) (concluding that a Review Panel reprimand was warranted for a lawyer's violation of Rule 1.15 where he did not maintain an operating account for his law firm; allowed some of his clients to deposit earned legal fees into his trust account; wrote a check to himself from his trust account for $1,300, believing that those funds were owed to him as fees, which resulted in an overdraft of about $41; and no clients were harmed, although the lawyer had three prior instances of confidential discipline); *In the Matter of Howard*, 292 Ga. 413, 413-414 (738 SE2d 89) (2013) (imposing a public reprimand for a lawyer's violation of Rule 1.15 where he mistakenly caused a $3,552 litigation funding check to be deposited into the firm's operating account rather than his trust account, resulting in the trust account being overdrawn, and he deposited personal funds into his trust account so that he could distribute anticipated settlement funds to his clients without waiting for the settlement drafts to clear the bank, but when the settlements did not occur as planned, he began withdrawing the personal funds from his trust account for day-to-day operations of the law firm); *In the Matter of Grant*, 287 Ga. 131, 131-133 (694 SE2d 647) (2010) (holding that a Review Panel reprimand was the appropriate sanction for a lawyer's violation of Rules 1.15 and 5.3 where she failed, among other things, to adequately supervise a paralegal who stole $2,000 from her client trust account or keep records reflecting the account balance for each of her clients). Indeed, our opinion in *Howard* suggested that at least a public reprimand should be the discipline imposed for even minor, technical violations of trust account rules that cause no harm to clients. See 292 Ga. at 414 ("We also agree that the appropriate punishment is a public reprimand, rather than a Review Panel reprimand, because the infraction in this case involved an admitted violation of trust account rules, and, although no harm was done to clients, a trust account is a high honor and privilege afforded to a member of the Bar, so even a technical violation should have public discipline so as to protect clients, courts, and the public.").

clients or disciplinary authorities, and various mitigating factors –

have resulted in suspensions.[11] I also note that the Special Master,

---

[11] See, e.g., *In the Matter of Smith Fitch*, 289 Ga. 253, 253-256 (710 SE2d 563) (2011) (imposing a one-year suspension with conditions for a lawyer's violation of Rules 1.15, 1.3, and 1.4 where she transferred nearly $7,000 from a client's trust account to her law firm's operating account without the client's permission and failed to timely return funds held for the client or provide to the client an accounting of the money or any billing statements, noting that the lawyer's "actions were not theft, but poor practice management" but that "[s]uspensions have been imposed for violations of Rules 1.15 (I) and (II) where the lawyer has made restitution, shown remorse and cooperated with the State Bar"); *In the Matter of Jones*, 280 Ga. 302, 302 (627 SE2d 24) (2006) (holding that a 12-month suspension was an appropriate sanction for a lawyer's violation of Rule 1.15 where he used over $43,000 from his clients' trust account to pay a promissory note that he had guaranteed for a friend, his law partner filed the underlying grievance with the State Bar, and there were several factors in mitigation, including that the lawyer's "actions caused no harm to any clients"); *In the Matter of Summers*, 278 Ga. 57, 57 (597 SE2d 364) (2004) (imposing a six-month suspension for a lawyer's violation of Rule 1.15 where he held $25,000 in his trust account for a client for about five years; for periods of time, the balance of the account was insufficient to cover the obligation to the client; and there were several factors in mitigation, including that the lawyer had "ma[d]e the client whole"); *In the Matter of Dansby*, 274 Ga. 393, 393-394 (553 SE2d 157) (2001) (holding that a three-year suspension with conditions was appropriate where a lawyer violated the predecessor of Rule 1.15 by comingling a client's settlement funds with the lawyer's personal funds and paying the client, who "ultimately [was] not harmed," a portion of the settlement proceeds with checks drawn on the law firm's operating account; two dissenting Justices believed disbarment was appropriate); *In the Matter of Frazier*, 273 Ga. 878, 878 (546 SE2d 272) (2001) (imposing a one-year suspension with conditions for a lawyer's violation of the predecessor to Rule 1.15 where over a three-month period, he wrote seven checks on his clients' trust account for amounts between $20 and $70, all of which were returned for insufficient funds, wrote a number of checks on the trust account for personal expenses, commingled his personal funds with the trust account funds, withdrew funds from the account that were not earned attorney fees, and there

29

Review Board, and State Bar all recommended a suspension (of one, two, and three years, respectively) as the appropriate sanction for Cook, although the longer periods recommended by the Review Board and State Bar should be discounted somewhat because they relied in part on a violation of Rule 8.4 (a) (4) that is not supported by the Special Master's factual findings (to which I agree with the majority opinion we should defer).

The Special Master recommended a one-year suspension despite his consideration in mitigation of the Bar's "seeming indifference" to the "complicity" in the Rule 1.15 violations of Cook's two law partners, who were the source of the grievance filed against Cook, and of the loss of Cook's "designated counsel" status for

were several mitigating factors, including that there was "no evidence or allegation that [the lawyer's] improper behavior resulted in clients failing to receive funds timely or in full"); *In the Matter of Hayes*, 272 Ga. 376, 376-377 (532 SE2d 371) (2000) (concluding that an 18-month suspension with conditions was appropriate for a lawyer's violation of the predecessor to Rule 1.15 where his client trust account contained "substantial negative balances" over an eight-month period, leading the Special Master to conclude that the lawyer's personal use of the account "constituted continuing and serious violations of his duty as an attorney," and various mitigating circumstances were present, including that "no clients were actually injured" and "all deficiencies were 'covered' by subsequent deposits").

railroad union cases if he were suspended, which Cook characterized as "tantamount to disbarment" because most of his practice consists of such cases. In Division 3 (a), the majority opinion says without explanation that "the mitigating factors present in this case . . . do not include the Bar's disparate treatment of Cook compared to his former partners" and makes no mention of the effect of a suspension on Cook's practice. But then in Division 3 (b), the opinion says that "[s]ome members of this Court" (suggesting less than the majority that concur in the whole opinion) agree with the Special Master's concerns about the seemingly unequal manner in which this disciplinary matter has been prosecuted against Cook but not his two partners and the benefit that their new firm may receive if Cook is suspended, "[r]egardless of whether we should consider these as mitigating factors."

Even if I agreed with what is said in Division 3 (b) about the Bar's apparent indifference to Cook's law partners' own professional obligation to safeguard their clients' funds as well as their apparent use of the disciplinary process to benefit financially by receiving

31

more railroad-union cases if Cook is suspended and cannot receive those cases, those would be issues as to which the Bar's Office of General Counsel should face scrutiny. But in my view (which was also the view of the Review Board), they are not proper considerations in mitigation of Cook's discipline. Whether *other* lawyers affiliated with Cook committed similar misconduct and should *also* be disciplined does not minimize the seriousness of what *Cook* did and the sanction that *he* should receive for his own misconduct. Nor should we consider the collateral consequences of the level of discipline that we appropriately impose based upon his misconduct. Attorney discipline – especially suspensions from the practice of law – routinely affects the ability of a lawyer to keep his or her clients (which is forbidden while a lawyer is suspended) and to obtain new clients if the lawyer is reinstated to practice. If such a suspension is warranted based on the seriousness of the professional misconduct, we should pay no heed to the lawyer's complaint about his or her business being impaired. A suspension is certainly not "tantamount to disbarment," because even if a suspension leaves a

32

lawyer struggling to attract new clients, unlike disbarment it allows the lawyer to return to practicing law without waiting at least five years, seeking recertification of fitness from the Fitness Board and this Court, and passing the bar exam again. See Part A, § 10, Rules Governing Admission to the Practice of Law.

It is telling that these supposed mitigating factors are not included in the ABA's Standards for Imposing Lawyer Sanctions and that the majority opinion cites no Georgia disciplinary case in which we have considered either of them. So while the majority opinion gives no explanation for its rejection of the disparate-enforcement factor and is unclear about its view of the collateral-consequence factor, it is clear to me that neither factor is properly considered in mitigation of Cook's discipline – which makes the imposition of a suspension even more appropriate in this case.

For these reasons, I cannot agree that other lawyers will be deterred, or that the public will be given confidence that this Court will maintain the ethics of the legal profession, when they see that the penalty for Cook's repeated and serious violations of Rule 1.15 –

violations that put large amounts of many clients' funds at great risk – is just a public admonition not to do that again. I respectfully dissent.

I am authorized to state that Chief Justice Melton joins in this dissent.