**NOTICE:** This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 19, 2024

S24Y1244.  IN THE MATTER OF CHRISTIAN AARON COOMER.

PER CURIAM.

This disciplinary matter is before the Court on the report and recommendation of Special Master Adam M. Hames, who recommends accepting the amended petition for voluntary discipline by Respondent Christian Aaron Coomer (State Bar No. 184995) and imposing a two-year suspension nunc pro tunc to August 16, 2023. In the petition, Coomer admitted violating Rules 1.7 (a),[1] 1.8 (a),[2] 1.8

---

[1] Rule 1.7 (a) provides, in relevant part, that a "lawyer shall not[, in the absence of informed consent,] represent or continue to represent a client if there is a significant risk that the lawyer's own interests . . . will materially and adversely affect the representation of the client."

[2] Rule 1.8 (a) provides that "[a] lawyer shall neither enter into a business transaction with a client if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, nor shall the lawyer knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(c),[3] and 1.16 (d)[4] of the Georgia Rules of Professional Conduct ("GRPC") as found in Bar Rule 4-102 (d), in connection with Coomer's legal representation of and business transactions with an elderly client that benefitted Coomer or his family. The Bar agrees that the proposed discipline is appropriate and that the Court should accept his petition for voluntary discipline. Because the record supports the admitted violations, and the proposed two-year

1. the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
2. the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
3. the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

[3] Rule 1.8 (c) provides that "[a] lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, grandparent, child, grandchild, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee."

[4] Rule 1.16 (d) provides "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned."

suspension falls within the broad range of discipline we have imposed for previous violations of the same rules at issue here, we accept the petition and impose the proposed two-year suspension nunc pro tunc to August 16, 2023.

### *Procedural History*

Coomer was appointed to serve as a Court of Appeals judge in 2018 and was the subject of an inquiry by the Judicial Qualifications Committee ("JQC"), which resulted in two prior opinions of this Court culminating in Coomer's removal from the bench. See *Inquiry Concerning Coomer*, 315 Ga. 841 (885 SE2d 738) (2023) ("*Coomer I*") (establishing the proper time frame and the standard for reviewing Coomer's actions); *Inquiry Concerning Coomer*, 316 Ga. 855 (892 SE2d 3) (2023) ("*Coomer II*") (removing Coomer from the bench).

On April 24, 2023, shortly after this Court issued its opinion in *Coomer I*, the State Bar filed a formal complaint in State Disciplinary Board Docket ("SDBD") Nos. 7500 and 7693, which generally tracked the client-related allegations in the JQC matter

and contended in relevant part that Coomer violated GRPC 1.7 (a),[5] 1.8 (a), and (c), and 1.16 (d). On February 14, 2024, six months after the issuance of this Court's opinion in *Coomer II*, Coomer filed his first petition for voluntary discipline, making admissions as to some rule violations and seeking as discipline a one-year suspension nunc pro tunc to August 16, 2023. The State Bar opposed the first petition, and on June 1, 2024, Coomer filed the amended petition for voluntary discipline at issue here. An evidentiary hearing was held before the Special Master on June 3, 2024, at which the Bar tendered deposition testimony from Coomer's client and Coomer testified and offered letters in support of his petition. Although neither party has filed exceptions to the Report and Recommendation, Coomer has filed a brief in this Court urging that the Court accept the report and impose the requested discipline.

---

[5] The Bar's formal complaint also charged two other rule violations, but the Bar has reasonably explained its decision to forgo further proceedings on those two charges. As to one of the counts, the Bar explained that the evidence established that the misconduct better fit other counts that Coomer was admitting; as to the other count, the Bar stated that the evidence "could be inconsistent with the required elements."

### *Facts Underlying the Admitted Violations*

The relevant facts, as apparently accepted by the parties and the Special Master, are that Coomer was admitted to the State Bar of Georgia in 1999, and, during the relevant time, ran a solo practice in Cartersville, Georgia, while also attaining the rank of Lt. Colonel in the Air Force Reserves and serving in the Georgia House of Representatives between 2011 and 2018. In February 2015, Coomer agreed to represent James Filhart, then 73 years old, in obtaining a guardianship or conservatorship over Filhart's girlfriend, and he advised Filhart that the representation would cost around $20,000 to $30,000. During the course of the representation, Coomer learned that Filhart was suffering from depression and was under the care of a licensed psychologist. Coomer was successful in this guardianship action and charged Filhart a total of around $80,000 for his work. But despite Filhart's requests, Coomer failed to provide an itemized invoice for the representation or to turn over his file to Filhart in a timely manner. Nevertheless, Coomer continued to

represent Filhart with respect to administration of the guardianship/conservatorship and other legal matters.

In January 2017, Filhart prepared a document that identified his psychologist as the residual beneficiary of his estate and included a list of specific bequests, including that Coomer receive Filhart's musical instruments and $100,000. In March 2018, Filhart executed a Last Will and Testament that Coomer had prepared and presented to him ("March 2018 Will"). That will identified Coomer as the executor, trustee, and a beneficiary, and it provided that Filhart's estate should be held in trust with lifetime income paid to Filhart's girlfriend and that, upon her death, the remaining assets should be distributed by Coomer in his discretion to various beneficiaries, including Coomer himself.

In late 2017, Coomer began to borrow money from Filhart. In December 2017, Filhart loaned $80,000 to CAC Holdings, LLC, ("CAC"), a limited liability company of which Coomer was the sole member. Commer presented Filhart a promissory note ("First Promissory Note"), promising to repay the loan in monthly

6

installments with the last installment due in December 2038 (at which time Filhart would be approximately 96 years old). Although the First Promissory Note refers to a "deed to secure debt of even date herewith," no such deed to secure debt was ever executed, meaning that the loan was unsecured.

CAC satisfied the First Promissory Note on March 8, 2018, but contemporaneously Filhart executed a second promissory note that had been prepared and presented to him for execution by Coomer ("Second Promissory Note"). Under the terms of the Second Promissory Note, Filhart loaned $159,000 to CAC, which agreed to repay the loan in monthly installments with the last installment due in April 2048 (at which time Filhart would be approximately 106 years old). As with the First Promissory Note, the Second Promissory Note referred to a "deed to secure debt of even date herewith," even though no such deed to secure debt had been executed, and, as a result, that loan also was unsecured. Then, in September 2018, Filhart and CAC executed a third promissory note for an additional $130,000 loan to CAC ("Third Promissory Note").

7

Like the other notes, this note was unsecured and was prepared and presented to Filhart for execution by Coomer. It provided for repayment in a single payment due on January 1, 2026.

The Bar contended that, at the time of the execution of each of the three promissory notes referenced above, Coomer failed to explain to Filhart (1) the significance of the fact that the loans were unsecured; (2) the significance of the fact that the notes were made by CAC as opposed to Coomer personally; (3) the significance of the fact that Coomer made no personal guarantee of the loans; (4) that the terms of each of the notes were more favorable to Coomer than the terms available from a commercial lender; and (5) the financial status of CAC, the borrower. Coomer admitted that he did not discuss with Filhart the issues of security or guaranty at the time the loans were signed but asserted that Filhart knew the loans were unsecured and would be made without personal guaranty.

Additionally, in June 2018, Coomer prepared and presented to Filhart an Irrevocable Living Trust ("Living Trust"), which designated Coomer as trustee and beneficiary, and which provided

8

Coomer with unfettered discretion to direct funds from the Living Trust, even while Filhart was alive. In September 2018, Coomer was appointed to the Georgia Court of Appeals. After the appointment was announced but before Coomer was sworn in, Filhart executed a new Last Will and Testament that Coomer had prepared and presented to him ("September 2018 Will"). The September 2018 Will was almost identical to the earlier will, except that it identified Coomer's wife, rather than Coomer, as the executor and trustee.

By early 2019, the relationship between Coomer and Filhart had deteriorated,[6] see *Coomer II*, 316 Ga. at 859, and Filhart sent an email in January 2019 demanding repayment of the loans. By 2020, Filhart had filed both a lawsuit and a Bar complaint against Coomer. Coomer testified at the evidentiary hearing before the Special Master that he was current on all payments due under the loans while they were active and that, eventually, he paid off both of the outstanding loans and forwarded Filhart's file to him. Coomer

---

[6] Filhart testified that the relationship soured when he learned that he owed $11,000 in taxes from the gains on the stocks he sold to fund a loan to Coomer.

also resolved Filhart's lawsuit with a payment of $50,000 in damages. Filhart was not reimbursed for the legal fees he incurred in obtaining relief. Filhart's complaints, in part, led to the JQC matter that resulted in Judge Coomer's suspension from the Court of Appeals in January 2021 and ultimately his removal from office in August of 2023. See *Coomer II*, 316 Ga. at 856-857.

### *Evidence in Mitigation/Aggravation*

After conclusion of the JQC matter, the Bar proceeded with the underlying disciplinary case and the Special Master held a hearing to take testimony as to aggravating and mitigating factors. At that hearing, Coomer testified that, prior to this situation, he had no disciplinary history of any kind but that, as a result of his interactions with this client, he was not only suspended and removed from the Court of Appeals, but his career in the Air Force Reserves — where he believed himself to be on track to be promoted to full Colonel — was also effectively ended as he was encouraged to retire from the active reserves. Coomer testified that since his removal from the bench, he has actively refrained from practicing

10

law, declining all offers or invitations to do so in anticipation of a disciplinary process that would require him to be suspended for some period of time. Coomer testified that he takes full responsibility for his bad judgment; he expressed remorse for his actions; and he apologized to everyone who was affected by those actions, including his client. Coomer stated that, since his removal from the bench, he has been trying to atone for his actions by donating both money and time to a variety of charitable activities, including a charity in Ukraine that helps displaced children; a school in the Palestinian West Bank; his church's food bank; Toys for Tots; a benevolence committee that supports retired missionaries and retired ministers; a Bartow County retired men's group; and various veteran service organizations, including Vet to Vet of Georgia (which provides services to disabled vets) and the Birdwell Foundation (which is focused on preventing suicide among veterans who suffer from PTSD and related mental illness).[7] Coomer testified

---

[7] Coomer stated that he was involved in some of these activities before 2023, but that his work with the veteran's groups and the retired men's groups began after he was removed from the bench.

that he has kept up with his continuing legal education requirements and has signed up for courses relevant to the issues he faced in this matter. In an effort to show good character, Coomer introduced eleven letters/statements from clients and former colleagues in the House of Representatives. The letters unanimously vouch for Coomer's moral character and reputation for honesty and integrity.

At the hearing, the Bar admitted Filhart's May 30, 2024, deposition testimony given for this disciplinary matter.[8] In that deposition, Filhart said that he moved to Georgia from Michigan in December 2006; that he hired Coomer in 2015 to represent him in the guardianship case; and that he was satisfied with the result Coomer achieved in that case, though he was not satisfied with the cost. Filhart said that Coomer initially estimated the cost of the case to be somewhere between $20,000 and $30,000, but, after it was over, Coomer told him that it would be an additional $50,000.

---

[8] Filhart was unable to testify in person because of his poor health.

Although Filhart did not think that the fee for the guardianship case was reasonable (and might not have pursued the guardianship case had he known the cost), he paid the additional money because he promised to do so. Filhart said that Coomer never provided him with billing records or anything that would show how much time he spent on the case. Filhart says that it was his idea to bequest his musical instruments to Coomer and that he also had a bank account that was set to transfer to Coomer on Filhart's death. He said that he was alone in life and had no one else to leave his money to since Coomer told him that it could be unethical to leave it to his psychologist. Filhart testified that he filed his grievance against Coomer once he realized that Coomer was looking out only for himself, and that he now believes that Coomer took advantage of him. Filhart said that, although Coomer has now repaid the loans, he had to pay a new attorney to obtain repayment and lost a "pretty good chunk" of what was recovered in the process. In response to questions from Coomer's counsel, Filhart agreed that Coomer has "redeemable qualities";

13

that Coomer is entitled to a "second chance"; and that Coomer "just made a mistake," which he is unlikely to repeat.

### *The Special Master's Report and Recommendation*

In his Report and Recommendation, the Special Master noted that in his amended petition for voluntary discipline, Coomer acknowledged that he violated various GRPC rules. Coomer admitted violating Rule 1.7 (a) when, during a legal representation, he borrowed money from Filhart and drafted two wills and a trust for him in which Coomer or his wife was designated as executor/trustee and he was designated as an alternate beneficiary. Coomer also admitted to violating Rule 1.8 (a) when through his single-member LLC, Coomer borrowed money on the terms set forth in the three separate promissory notes. Coomer also admitted that he violated Rule 1.8 (c) by preparing the March 2018 Will identifying himself as the executor, trustee, and alternate beneficiary; by preparing the Living Trust on Filhart's behalf and designating himself as alternate trustee and successor beneficiary; and by preparing Filhart's September 2018 Will identifying Coomer's wife

14

as the executor and trustee and keeping himself as an alternate beneficiary. Finally, Coomer admitted that he violated Rule 1.16 (d) by failing to deliver Filhart's file to him in a timely manner when he requested it. The Special Master noted that the Bar did not disagree with any aspect of Coomer's admissions.

With regard to the recommended sanction, the Special Master noted that the maximum penalty for a single violation of Rule 1.7 (a) is disbarment and the maximum penalty for a single violation of Rules 1.8 (a), 1.8 (c), and 1.16 (d) is a public reprimand. In determining the appropriate discipline, the Special Master considered the primary purposes of disciplinary actions to protect the public from unqualified attorneys and to protect the public's confidence in the profession, see *In the Matter of Blitch*, 288 Ga. 690, 692 (706 SE2d 461) (2011), and the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards"), which require examination of "[1] the duty violated; [2] the lawyer's mental state; [3] the potential or actual injury caused by the lawyer's misconduct; and [4] the existence of aggravating or mitigating

factors." See *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996). The Special Master recognized that each disciplinary case must be decided on its own facts and that the level of punishment "rests in the sound discretion of" this Court. See *In the Matter of Cook*, 311 Ga. 206, 218 (3) (a) (857 SE2d 212) (2021).

The Special Master then concluded that Coomer violated the duties he owed to his clients and to the profession generally, see ABA Standards §§ 4.3, 7.0; that Coomer acted knowingly with respect to these rule violations, see ABA Standards, "Definitions" (defining knowledge as the "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result"); and that Coomer's actions not only raised the possibility of potential injuries, but also caused Filhart to suffer actual injuries as he was forced to pay unexpected income tax as a result of funding a loan to Coomer, and to hire an attorney, at his own cost, to recover repayment of Coomer's improper loans. Therefore, the Special Master concluded that a suspension was the presumptive discipline in this case. See

ABA Standard 4.32 (suspension "generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict and causes injury or potential injury to a client"); see also ABA Standards 4.12 (suspension generally appropriate where lawyer knew or should have known that he was dealing with a client's property improperly and causes injury or potential injury).

Turning to aggravating and mitigating factors, the Special Master found in aggravation that Coomer acted with a dishonest and selfish motive, see ABA Standard 9.22 (b); that his actions involved a pattern of misconduct rather than a single, isolated incident since Coomer wrote and rewrote Filhart's wills and received three favorable loans from Filhart, see ABA Standard 9.22 (c); and that Coomer's actions were not the result of inexperience but rather were intentional acts by a lawyer who had substantial experience in the practice of law, see ABA Standard 9.22 (i). But the Special Master found most important the fact that Coomer's client was a vulnerable victim, see ABA Standard 9.22 (h), noting that, while

17

Filhart must have had a certain level of sophistication to accumulate the wealth he did, it was "abundantly clear that he trusted Coomer [and that] Coomer preyed on that trust and took advantage of [] Filhart."

In mitigation, the Special Master noted that Coomer has no prior disciplinary history and that the actions appear to have been "an aberration begat by opportunity and not representative of Coomer's practice." See ABA Standard 9.32 (a). The Special Master concluded that Coomer expressed genuine remorse that recognized the consequences not just for himself, but also for the other people who had been harmed by his actions. See ABA Standards 9.32 (l). The Special Master further noted that Coomer had demonstrated that he is otherwise a person of good character and reputation, see ABA Standard 9.32 (g), not only through the eleven letters he introduced, which praised him as a person of integrity and good character, but also through the actions he had taken to atone for his

18

mistakes, both to the person wronged and to others through his significant involvement with a variety of charitable organizations.[9]

In terms of the appropriate discipline, the Special Master observed that, although he was concerned that a recommendation of suspension might be seen as favoritism to a former judge of the Court of Appeals and former member of the General Assembly with "powerful friends," such a potential perception should not result in Coomer getting treated more harshly than any other lawyer who had committed the same violations. He then considered that the parties have agreed to the discipline proposed in Coomer's amended petition for voluntary discipline and that the range of discipline imposed for similar types of disciplinary infractions varies widely in

---

[9] The Special Master expressed concern and/or skepticism as to the application of ABA Standards 9.32 (d) (timely good faith effort to make restitution or to rectify the consequences of misconduct), (e) (cooperative attitude toward proceeding), and (k) (imposition of other penalties or sanctions), and, thus left unclear what, if any, weight he gave to those factors. But we need not consider whether those factors apply here since we ultimately agree that, under the particular facts of this case, and even without consideration of those factors, Coomer's requested sanction of a two-year suspension is an appropriate sanction to impose for Coomer's admitted violations of the GRPC.

Georgia. See *In the Matter of Oellerich*, 278 Ga. 22 (596 SE2d 156) (2004) (disbarring attorney with no prior disciplinary history who received unsecured $120,000 loan from client on terms favorable to attorney, was unremorseful and had not made restitution); *In the Matter of Queen*, 277 Ga. 348 (594 SE2d 323) (2003) (30-month suspension for attorney with no prior discipline, who violated the conflict rules by entering into a financial relationship with client); *In the Matter of Kunda*, 306 Ga. 109 (829 SE2d 65) (2019) (twelve-month suspension imposed for violations of Rule 1.7, 1.8 (c) and 1.15 (I) upon a petition for voluntary discipline, where attorney, with no prior disciplinary history acted under a conflict of interest but made restitution and was remorseful). Ultimately, after taking all of the above considerations into account, the Special Master recommended that the Court accept Coomer's amended petition for voluntary discipline and suspend his law license for two years for his violations of the GRPC. Finally, in terms of whether the suspension should be imposed nunc pro tunc, the Special Master agreed with the Bar that Coomer had met the requirements to have the sanction entered nunc

pro tunc in that he gave sworn testimony that he had not practiced law since August 16, 2023 (when he was removed as a judge), despite opportunities to do so, and had refrained from practicing law in contemplation of these disciplinary matters.[10] *In the Matter of Onipede*, 288 Ga. 156, 157 (702 SE2d 136) (2010).

### *Conclusion*

Based on our review of the record, the Special Master's findings of fact are supported by the record, as is his analysis of the duties violated, Coomer's mental state, and the potential for and actual injury caused by Coomer's misconduct. In the light of the various aggravating and mitigating circumstances, and particularly the State Bar's agreement that the proposed discipline was "appropriate and sufficient," we agree with the Special Master's overall conclusion that a two-year suspension nunc pro tunc to August 16, 2023, is an appropriate sanction in this case.

---

[10] We note that Coomer represented that he ceased practicing law upon his appointment to the Court of Appeals such that, upon his removal from that position (from which point he refrained from taking on new legal work) there were no additional steps he needed to take to comply with Bar Rule 4-219 (b).

21

The special master noted that this suspension may seem inconsistent to some with our conclusion that the same underlying conduct regarding Filhart required Coomer's removal as a judge, but concluded that it would be unfair to treat Coomer more harshly merely to avoid such a perception. We agree, and three key points dispel that apparent inconsistency. First, Coomer's JQC charges went beyond the Filhart matter to include a number of campaign finance violations. Second, this voluntary resolution is supported by the Bar; if we rejected it as too light, the Bar would then be in the position of having to prosecute charges (some of which it acknowledges the evidence may not support) and seek penalties higher than it believes are necessary and sufficient to serve the goals of the disciplinary process. Although that may be necessary in some cases, we conclude that it is not so here, where the proposed voluntary discipline falls within the range of discipline we have imposed for similar violations in other cases.

Finally, the Code of Judicial Conduct holds Georgia judges to a higher standard than the standard the Rules of Professional

Conduct imposes on Georgia lawyers. Rightly so. "The judiciary's judgment will be obeyed only so long as the public respects it, and that respect will not long survive judges who act in a manner that undermines public confidence in their judgment and integrity." *Inquiry Concerning Coomer*, 316 Ga. at 855-856. Although part of the public interest served by regulating the practice of law includes sustaining public confidence in the legal system, that important interest is not as acute when regulating lawyers as it is for judges. And that interest must be balanced against lawyers' fundamental right under the Georgia Constitution to "to pursue a lawful occupation of their choosing free from unreasonable government interference." *Raffensperger v. Jackson*, 308 Ga. 736, 740 (2) (843 SE2d 576) (2020).

Accordingly, Christian Aaron Coomer is hereby suspended from the practice of law for a period of two years nunc pro tunc to August 16, 2023. Because there are no conditions on Coomer's reinstatement other than the passage of time, there is no need for him to take any action either through the State Bar or through this

23

Court to effectuate his return to the practice of law. Instead, the suspension based on this opinion will expire by its own terms on August 16, 2025. See *In the Matter of Franklin*, 299 Ga. 4, 7 (785 SE2d 535) (2016). Coomer is reminded of his duties pursuant to Bar Rule 4-219 (c).

*Petition for Voluntary Discipline Accepted. Two-Year Suspension. All the Justices concur, except Bethel and Colvin, JJ., not participating.*