316 Ga. 855
FINAL COPY

## S21Z0595. INQUIRY CONCERNING JUDGE CHRISTIAN COOMER.

PER CURIAM.

In our system of separated powers, each branch of state government secures compliance with its decisions in different ways. Alexander Hamilton famously put it this way in Federalist No. 78: "The executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend on the aid of the executive arm even for the efficacy of its judgments." The Federalist

No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton).[1]

That our judgment is our only power shapes the kind of conduct we must insist upon from Georgia's judges. The judiciary's judgment will be obeyed only so long as the public respects it, and that respect will not long survive judges who act in a manner that undermines public confidence in their judgment and integrity. In this case, Court of Appeals Judge Christian Coomer is charged with patterns of behavior regarding his use of campaign funds and his dealings with a legal client that allegedly undermined public confidence. The Hearing Panel of the Judicial Qualifications Commission ("JQC") found that he indeed committed those acts, that he did so in bad faith, that those acts violated the Georgia Code of Judicial Conduct, and that the violations warranted his removal.

Upon review, the matter is initially a close one: at least some

---

[1] The United States Supreme Court has quoted from this passage of the Federalist Papers in explaining the importance of the independence and integrity of the judiciary. See *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (135 SCt 1656, 191 LE2d 570) (2015); *Evans v. Gore*, 253 U.S. 245, 249-250 (40 SCt 550, 64 LE 887) (1920), overruled on other grounds by *United States v. Hatter*, 532 U.S. 557, 567 (121 SCt 1782, 149 LE2d 820) (2001).

evidence supports many of the Hearing Panel's findings, while at least some evidence also supports many of Judge Coomer's contradictory explanations. But the Hearing Panel viewed the live testimony personally and weighed demeanor and credibility in making its findings, and we generally defer to its findings if supported by sufficient evidence. And enough of the Hearing Panel's findings are supported by sufficient evidence that, notwithstanding alternative ways that the evidence could have been viewed, we defer to the Hearing Panel's findings regarding Judge Coomer's actions and the bad faith in which the Hearing Panel found those actions to have been taken. Once we arrive at that conclusion, the matter ceases to be close; the appropriate sanction is to remove Judge Coomer from the bench.

1. *Background and Procedural History*

As recounted in greater detail in our decision the last time this matter came to our Court, see *Inquiry Concerning Coomer*, 315 Ga. 841 (885 SE2d 738) (2023), Judge Coomer was admitted to the State Bar of Georgia in 1999. At the time of his appointment to the Court

of Appeals in 2018, he both maintained a private law practice and served in the Georgia House of Representatives. He applied for a vacancy on the Court of Appeals on March 29, 2018, withdrawing from consideration the following month. Judge Coomer applied for a vacancy on this Court on August 30, 2018, and on September 14, 2018, Governor Nathan Deal announced his intention to appoint Judge Coomer to the Georgia Court of Appeals. On October 31, 2018, Governor Deal appointed Judge Coomer to the Court of Appeals, and Judge Coomer was sworn in to the position that same day. Judge Coomer was elected to a full six-year term in 2020.

The JQC in late 2020 charged Judge Coomer with a number of alleged violations of the Code of Judicial Conduct. The charges, later amended, largely involve campaign-finance issues and Judge Coomer's handling of one particular client relationship that began before Judge Coomer became a judge. As a result of those charges, Judge Coomer has been suspended from office since January 6, 2021, pending final resolution of the JQC's proceedings against

4

him.[2]

In late 2022, the JQC tried Judge Coomer in a hearing held over a three-month period. On January 30 of this year, the Hearing Panel submitted its Report and Recommendation to this Court, finding that the Director had proved most of the counts charged and recommending that we remove Judge Coomer from office.

In March, this Court issued an opinion concluding that two key issues necessitated a remand for additional findings. First, many of the JQC's charges arose from conduct by Judge Coomer before he became a judge or judicial candidate, but the text of the Code makes clear that it does not reach conduct of those who are neither judges nor judicial candidates. See *Inquiry Concerning Coomer*, 315 Ga. at

---

[2] To be clear, Judge Coomer did not suspend himself voluntarily. Instead, this Court suspended him after Judge Coomer agreed, for purposes of the JQC's motion to suspend him, that the JQC could prove the allegations against him and that the allegations in the motion and the original formal charges, if taken as true, warranted suspension under the standard set forth in JQC Rule 15 (C). The Court previously had rejected Judge Coomer's initial attempt to consent to a suspension without having satisfied the evidentiary standard of the rule. This interim suspension was with pay as provided by JQC Rule 15 (C) and the Georgia Constitution's requirement that "[a]n incumbent's salary, allowance, or supplement shall not be decreased during the incumbent's term of office." Ga. Const. of 1983, Art. VI, Sec. VII, Par. V.

5

850-855 (4) (b). And second, the Hearing Panel applied the wrong standard for determining whether a judge may be disciplined under the Georgia Constitution; given the manner in which the Amended Formal Charges were framed, and given that none of the counts against Judge Coomer allege anything about actions he took in a judicial capacity, in order for Judge Coomer to be disciplined, the Director had to prove that he acted in bad faith. See id. at 858-862 (6). We therefore directed the Hearing Panel to, among other things, "issue new findings that (1) determine which counts against Judge Coomer that were proved by clear and convincing evidence are properly within the scope of the Code of Judicial Conduct; (2) clearly articulate which counts, if any, may support discipline within the constitutional framework as articulated in this opinion, with particular attention toward whether the Director proved bad faith for any of those counts; and (3) reconsider what, if any, discipline is appropriate based on the revised findings." Id. at 863 (7).

The Hearing Panel issued a new Report and Recommendation, filed with this Court on May 12, 2023. That report concurred with

6

the parties' agreement as to which charges survived our March opinion in that they "involve allegations of misconduct occurring during the time [that Judge Coomer] was either a candidate for judicial office, had been appointed to the Court of Appeals, or was actually serving as a state-wide appellate judge." The Hearing Panel found that Judge Coomer acted in bad faith while engaging in all of the misconduct at issue in the surviving charges. And the Hearing Panel reaffirmed its conclusion that Judge Coomer should be removed from office. Judge Coomer filed Exceptions to that Report and Recommendation, and we then received a response brief from the JQC Director and a brief from Judge Coomer replying to the JQC's response.

2. *Analysis*

In considering the Hearing Panel's Report and Recommendation and Judge Coomer's Exceptions to it, we begin by reviewing the Hearing Panel's findings about Judge Coomer's underlying conduct during the relevant time period. We determine that at least the findings ultimately material to our conclusion are

7

not clearly erroneous.[3] We then consider whether these findings support the Hearing Panel's conclusion that Judge Coomer violated the Code of Judicial Conduct, and conclude that findings as to at least some of this conduct support a conclusion that Judge Coomer violated Rule 1.1 of the Code. Without reaching a conclusion as to whether *all* of the Hearing Panel's findings of Rule 1.1 violations are supported, we move on to considering whether Judge Coomer's conduct violated Rule 1.2 (A), and whether Judge Coomer's conduct that violated Rule 1.1 and/or Rule 1.2 (A) was undertaken in bad faith. We conclude that the record does support the Hearing Panel's ultimate findings that this conduct was undertaken in bad faith, and that, not only did some of Judge Coomer's conduct violate Rule 1.1, but at least a substantial portion of his conduct violated Rule 1.2 (A). Having thus concluded that it is within our constitutional power to discipline Judge Coomer, we consider the appropriate sanction, and

---

[3] Judge Coomer levies a variety of challenges to the Hearing Panel's findings. A number of those challenges are well-taken. But the well-taken challenges are made to findings that are ultimately unnecessary to our conclusion, so we do not address them in this opinion.

decide that Judge Coomer should be removed from office.

(a) *Generally speaking, the Hearing Panel's material findings about Judge Coomer's conduct are not clearly erroneous.*

The most detailed findings of the Hearing Panel are those included in the Hearing Panel's original Report and Recommendation, which the Hearing Panel incorporated by reference in its Second Report and Recommendation. Those findings include the following. A significant portion of the conduct at issue involved Judge Coomer's relationship with James Filhart, an elderly client whom Judge Coomer began representing in 2015. At that time, Filhart hired Judge Coomer to pursue an action for guardianship of Filhart's girlfriend. After successful resolution of that action, Filhart continued to engage Judge Coomer's assistance on various legal issues, including various estate-planning matters. Among those matters, Judge Coomer drafted a May 2018 will for Filhart that named Judge Coomer and his heirs among the beneficiaries and Judge Coomer as executor and trustee. By the terms of the will, Judge Coomer had authority to cancel debts owed

9

to Filhart upon Filhart's death.[4]

Also before Judge Coomer was sworn in as a judge, he accepted several loans of money from Filhart. During the relevant time period, while his August 2018 application of a state appellate judgeship was pending (and thus the Code applied to him), Judge Coomer drafted a promissory note dated September 8, 2018, in which he accepted a loan of $130,000 from Filhart to CAC Holdings LLC, a limited liability company solely controlled by Judge Coomer that effectively lacked assets. The note provided an interest rate of four percent with a single repayment on January 1, 2026, when Filhart would be more than 80 years old. The loan was not secured, and Judge Coomer provided no personal guarantee. Filhart discussed with Judge Coomer the prospect of liquidating stock holdings to fund the loan and did in fact sell various stocks to fund the loan.

---

[4] The drafting of the May 2018 will did not occur during a time that Judge Coomer was subject to the Code of Judicial Conduct and thus cannot itself support a violation of the Code, but the will's terms are relevant because they were still in effect at the time that Judge Coomer accepted a loan from Filhart in September 2018 (a time at which he was subject to the Code).

On September 19, 2018, five days after the announcement of Judge Coomer's appointment to the Court of Appeals, Filhart executed a new will drafted by Judge Coomer. This will also named Judge Coomer and his heirs as beneficiaries, but Judge Coomer's spouse was designated to serve as executor and trustee.

By early 2019, after Judge Coomer had been sworn in to the Court of Appeals, the relationship with Filhart had soured. On February 22, 2019, Filhart e-mailed Judge Coomer demanding that Judge Coomer return "all the money you borrowed from me asap" and stating that because of Judge Coomer "talking me into selling all my stocks at one time, I owe $11,000 more [in] taxes than I would have if I hadn't sold them." Judge Coomer replied via e-mail later that day, stating, "I didn't tell you to sell your stocks and I don't know anything about that." Filhart also demanded Judge Coomer provide invoices and other documents related to Judge Coomer's representation of him, but for more than a year, Judge Coomer refused, saying he would not communicate with Filhart until he provided a letter from a doctor stating that he was of sound mind.

Judge Coomer repaid the September 2018 loan in full in April 2020, but only after Filhart filed a lawsuit against him. He provided invoices and other requested documents to Filhart in June 2020, but only after the JQC had initiated its investigation.

The other relevant allegations against Judge Coomer involve campaign-finance issues. In three instances in October and November 2018, Judge Coomer transferred campaign funds to his law firm operating account and, in two of those instances, failed to report the transfers on his campaign contribution disclosure report ("CCDR"). Judge Coomer claimed that the three transfers were to reimburse his law firm assistant for work she did on campaign- or legislative-related activities, but neither Judge Coomer nor his assistant documented or kept track of the time spent on that work.

A final set of campaign-finance allegations stems from a trip that Judge Coomer took to Hawaii with his family in the fall of 2018, after his appointment to the Court of Appeals had been announced but before he had been sworn in to the court and relinquished his role as a legislator. Although Judge Coomer attempted to identify a

12

legislative purpose for the trip, ultimately the trip was entirely leisure. Judge Coomer used a credit card to purchase airfare for the trip for himself and his family in June and August 2018 and to purchase goods and services while in Hawaii. Judge Coomer paid the credit card bill for those purchases using funds from his campaign account. Judge Coomer reimbursed his campaign account for the trip expenses after the trip, although he did not do so fully until after the Georgia Campaign Finance Commission ("CFC") began investigating him. Judge Coomer failed to disclose the use of campaign funds for the Hawaii trip on his CCDRs for September 30, 2018, October 25, 2018, and December 31, 2018.

As discussed in our prior opinion in this matter, "[i]n considering whether the Director has met the standard of proof as to charges of misconduct, we employ a clear and convincing proof standard." *Inquiry Concerning Coomer*, 315 Ga. at 847 (3) (citation and punctuation omitted). We generally review factual findings by the JQC Hearing Panel for clear error and defer to the Hearing

13

Panel's credibility determinations. See id.[5] Generally speaking, we cannot say that these findings by the Hearing Panel are clearly erroneous, as there is sufficient evidence to support the findings. Indeed, many of the factual findings detailed above are supported by documentary evidence or otherwise undisputed. Judge Coomer's principal argument against the Hearing Panel's findings is that the evidence supports different findings instead. And he is right that there is evidence that could have supported different findings, had the Hearing Panel been convinced otherwise. But Judge Coomer's argument is ultimately unpersuasive because the record does not *compel* the different findings that he prefers; instead, this record would have supported findings in either direction, and we defer to the findings that the Hearing Panel actually made (and that are supported by the record).

(b) *Some of the conduct by Judge Coomer found by the*

---

[5] Although we do generally defer to factual findings by the Hearing Panel (and ultimately do so here on the critical points), the broad and discretionary nature of our review in judicial discipline matters means that we need not always defer even in situations where we would defer to a factfinder in an ordinary appeal. See *Inquiry Concerning Coomer*, 315 Ga. at 847 (3).

14

*Hearing Panel violated Rule 1.1 of the Code of Judicial Conduct.*

That the Hearing Panel's factual findings as outlined above are supported by record evidence does not necessarily mean that each of these instances of alleged misconduct amounted to a violation of the Code of Judicial Conduct. In order for an action by Judge Coomer to provide a basis for discipline, it must constitute a violation of some provision of that Code.

And even if an action does violate a provision of the Code, given that Judge Coomer's conduct at issue here did not involve an exercise of judicial power, the Georgia Constitution does not permit us to discipline Judge Coomer unless his actions were also taken in bad faith. The Georgia Constitution sets out five grounds for discipline, two of which were alleged as a basis for discipline of Judge Coomer in the Amended Formal Charges: "willful misconduct in office" and "conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const. of 1983, Art. VI, Sec. VII, Par. VII (a). "Willful misconduct in office" encompasses only actions taken in a judicial capacity, and, as we

noted in our prior opinion, "[n]one of the counts against Judge Coomer allege anything about actions he took in a judicial capacity." *Inquiry Concerning Coomer*, 315 Ga. at 860 (6). When a judge is acting as a judge, the judge is acting in a judicial capacity; when a person who is a judge acts outside of that capacity, this Court's ability to discipline the judge is more limited. In order for actions taken outside of a judge's judicial capacity to constitute "conduct prejudicial to the administration of justice" and thus within our constitutional power to discipline, those actions must be taken in bad faith. See id. at 858-860 (6). Therefore, any discipline of Judge Coomer in this matter requires a finding that he carried out the conduct at issue in bad faith.[6]

---

[6] In a footnote to his Exceptions, Judge Coomer argues that finding that he acted in bad faith when bad faith was not alleged in the Amended Formal Charges violates his due process rights under state and federal law. But the Amended Formal Charges did allege that Judge Coomer took actions that constituted "conduct prejudicial to the administration of justice which brings the judicial office into disrepute" within the meaning of Article VI, Section VII, Paragraph VII (a) of the Georgia Constitution. And, even before our prior opinion in this case, it was established law that in order for actions taken outside of a judge's judicial capacity to fall within that provision, those actions must be taken in bad faith. See *Inquiry Concerning Coomer*, 315 Ga. at 859 (6) (citing cases). Accordingly, the allegations put Judge Coomer on notice that

Considering first whether Judge Coomer's various actions violated the Code of Judicial Conduct, the JQC generally alleged that Judge Coomer's conduct violated two rules found in the Code of Judicial Conduct: Rules 1.1 and 1.2 (A). The JQC also alleged a few instances in which Judge Coomer violated Rule 4.2 (B), one of which the Hearing Panel found was encompassed within the time period during which Judge Coomer was governed by the Code.

Several actions by Judge Coomer clearly amounted to violations of Rule 1.1 of the Code of Judicial Conduct; the only question is whether the particular action was taken in bad faith

---

bad faith was required to prove the charges against him, and this argument fails.

Elsewhere in his Exceptions, Judge Coomer argues that his due process rights were violated by a number of discovery rulings by the Hearing Panel that deprived him of particular evidence, either altogether or in advance of certain testimony. He also argues that the Hearing Panel erred in curtailing his banker's testimony about Judge Coomer's lack of prior deceitful behavior and lack of financial distress. And he argues that his due process rights were violated because the JQC "secretly subpoenaed all of Judge Coomer's bank records and used the GBI to do so in violation of JQC Rule 4 (B) (6), Comment 2's prohibition on 'use [of] active law enforcement officials or staff to investigate complaints . . .' and Judge Coomer's right to move to quash overly broad subpoenas under JQC Rule 14 (E)." We conclude that Judge Coomer has not shown that the Hearing Panel exceeded its authority in these rulings in any way material to our resolution of this matter.

17

such that discipline is constitutionally permissible, which we address in conjunction with our discussion of whether Judge Coomer's actions violated Rule 1.2 (A). Rule 1.1 provides that "[j]udges shall respect and comply with the law." Coomer acknowledges that his drafting of the September 2018 will violated Rule 1.8 (c) of the Georgia Rules of Professional Conduct ("GRPCs"), which states that "[a] lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, grandparent, child, grandchild, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee." The Code defines "law" as "denot[ing] court rules as well as statutes, constitutional provisions, judicial emergency orders . . . and decisional law, including the Code of Judicial Conduct and Advisory Opinions of the Judicial Qualifications Commission." See Code Terminology. The GRPCs are rules promulgated by this Court, see *Bernocchi v. Forcucci*, 279 Ga. 460, 463 (2) (614 SE2d 775) (2005), which presumptively brings them within the scope of "court rules," and Judge Coomer makes no

argument that the GRPCs are not "court rules."[7] As a result, the drafting of the September 2018 will violated Rule 1.1.

The same goes for the two instances within the relevant time period in which Judge Coomer failed to disclose on his CCDR transfers from his campaign account to his law firm account. OCGA § 21-5-34 (b) (1) (B) requires candidates for election to public office to file CCDRs that include certain information about any expenditure by the campaign greater than $100. By failing to do so in these two instances, Judge Coomer violated Rule 1.1 of the Code of Judicial Conduct.

Regarding the Hawaii trip, a candidate's campaign funds are permitted to be used to pay for only "ordinary and necessary expenses . . . incurred in connection with such candidate's campaign for elective office or such public officer's fulfillment or retention of such office." OCGA § 21-5-33 (a). The record shows that Judge Coomer did not have a campaign- or legislative-related reason for

---

[7] Because no such argument is before us today, we do not foreclose such an argument in a future case.

19

his family's Hawaii vacation, either when he initially purchased the airline tickets for his family or at any subsequent point, despite attempting to manufacture one. Judge Coomer argues that it would have been permissible to use campaign funds to pay for trip expenses for him and his wife had he found a legitimate legislative purpose for the trip and that it was his intent to do so. But Judge Coomer does not suggest, because he cannot, that it would have ever been proper to use campaign funds to pay for travel and other vacation expenses for his children. As confirmed by the CFC's consent order, Judge Coomer's use of campaign funds to pay for the Hawaii trip were "unordinary and unnecessary expenses" that violated OCGA § 21-5-33 (a). And thus Judge Coomer violated Rule 1.1.[8]

---

[8] The Hearing Panel also found that Judge Coomer's use of campaign funds for the Hawaii trip violated Rule 4.2 (B) of the Code of Judicial Conduct, which provides that "[j]udicial candidates, including incumbent judges, shall not use or permit the use of campaign contributions for the private benefit of themselves or members of their families." The Hearing Panel concluded that the rule was violated because Judge Coomer used campaign funds to pay for goods and services in Hawaii for his and his family's personal benefit after he had been appointed as a judge. Although Judge Coomer argues that the Hearing Panel's finding that he acted in bad faith in making these

Looking past these clear Rule 1.1 violations, Judge Coomer has raised several serious questions about whether certain of his other actions actually violated the GRPCs and campaign-finance laws as the JQC alleges, and, therefore, whether those actions violated Rule 1.1.[9] We do not need to resolve these questions about the other alleged violations of particular GRPC or campaign-finance rules, however, because as discussed below, we conclude that the Hearing Panel did not clearly err in finding that at least a substantial portion

expenditures is not supported by the record, he does not appear to contest its conclusion that this rule was violated. There does not appear to be any published Georgia appellate decision construing the contours of Rule 4.2 (B), including whether it applies to contributions solicited for a campaign for an office other than a judicial office. Given Judge Coomer's failure to take exception to the Hearing Panel's interpretation of the rule, and given that we conclude that at least certain use of campaign funds for the Hawaii trip violated Rule 1.2 (A), this case does not require us to resolve any questions about the parameters of Rule 4.2 (B).

[9] For instance, he argues that GRPC 1.8 (a)'s requirement that generally transactions entered into with clients must be fair and reasonable does not apply to the loan that he received from Filhart because Filhart was not a client at the time that the loan was accepted; the Hearing Panel made no clear finding about whether Filhart was a client at that precise time. Judge Coomer also raises difficult questions about whether the GRPCs the Hearing Panel found he violated in failing to provide certain documents even apply to the sort of requests at issue. And he questions the enforceability of a campaign-finance regulation, Ga. Comp. R, & Regs., r. 189-3-.04 (1), which he suggests imposes a requirement for detail in disclosure of credit card transactions that is not authorized by OCGA § 21-5-6 (a) (7), a legal question that no published judicial decision appears to address.

21

of that conduct also violated Rule 1.2 (A) of the Code of Judicial Conduct.

(c)     *Other conduct violated Rule 1.2 (A) of the Code of Judicial Conduct, and the Hearing Panel's findings that Judge Coomer acted in bad faith are supported by the record.*

Rule 1.2 (A) of the Code of Judicial Conduct provides that "[j]udges shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." This Rule also existed in similar form in the former Canon 2 (A), which directed judges to both "respect and comply with the law" and act in "a manner that promotes public confidence in the integrity and impartiality of the judiciary[.]"[10] The current rule was adopted by this Court in May 2015, effective January 1, 2016.  See *In re Judicial Qualifications Comm. Formal Advisory Opinion No. 239*, 300 Ga. 291, 291 n.1 (794 SE2d 631) (2016). The current

---

[10] We note that at some point Canon 2 (A) was revised from a rule that used the term "should" to one that used the term "shall." Compare *Inquiry Concerning Peters*, 289 Ga. 633, 633 n.2 (715 SE2d 56) (2011); with *Matter of Inquiry Concerning a Judge No. 1305*, 259 Ga. 640, 642 (2) (388 SE2d 328) (1989). As explained in the Preamble to the current Code of Judicial Conduct, the use of the term "shall" signifies a "binding obligation[,]" while the use of the term "should" indicates an "advisory statement[.]"

provision has been employed with some frequency in recent years as a basis for discipline of Georgia judges. See, e.g., *Inquiry Concerning Norris*, 314 Ga. 10, 12 (2) (875 SE2d 627) (2022); *Inquiry Concerning Baker*, 313 Ga. 359, 360 (1), 361-363 (2) (870 SE2d 356) (2022); *Inquiry Concerning Hays*, 313 Ga. 148, 149-150 (868 SE2d 792) (2022). But although this Court has periodically discussed whether a particular fact pattern violates Rule 1.2 (A) or former Canon 2 (A), the Court has offered little engagement with the text of the rule, the kind of analysis that generally applies, and the outer boundaries of the rule, which is itself fairly vague. See *Inquiry Concerning Baker*, 313 Ga. at 361 (1), 362-363 (2) (Court finding itself unable to conclude, without additional information, that judge violated Rule 1.2 (A) by receiving assistance from court staff on personal matters, giving city solicitor feedback on prosecutors' performance, and requesting reassignment of certain prosecutors); *Matter of Inquiry Concerning a Judge No. 94-70*, 265 Ga. 326, 329 (3) (454 SE2d 780) (1995) (concluding that magistrate obtaining felony warrants for entire board of commissioners in the midst of a political squabble

23

involving her salary violated former Canon 2 (A)'s prescription to act in a manner that promotes public confidence in the judiciary).[11]

We recognize that the broad language at issue — which says the rule applies "at all times" and invokes a standard based on how the public might *perceive* particular conduct — must be understood in the light of judges' due process right to fair notice of what conduct may lead to discipline. See *Inquiry Concerning Coomer*, 315 Ga. at 849 (4) (a) & n.3 (explaining that the JQC's authority to enforce the Code of Judicial Conduct is limited by state and federal due process protections, which include "fair notice of what conduct is prohibited"); *Matter of Inquiry Concerning a Judge No. 491*, 249 Ga. 30, 31 (287 SE2d 2) (1982) (opining that prior Canon 2 (A) was "extremely broad" and had been "attacked as being nebulous and incapable of rational application" before concluding with "no hesitancy" that particular conduct at issue in the case violated rule).

---

[11] Because pertinent language of Canon 2 (A) was carried forward into Rule 1.2 (A), the prior case law interpreting the former canon is relevant. See *In re Judicial Qualifications Comm. Formal Advisory Opinion No. 239*, 300 Ga. at 291 n.1.

And given the frequency with which Rule 1.2 (A) is invoked as a basis for seeking judicial discipline, the JQC should keep these concerns in mind in future cases in which it seeks to use this rule.

But whatever the limits to Rule 1.2 (A)'s enforceability, at least a substantial portion of the conduct that the Hearing Panel found Judge Coomer engaged in falls well within those limits. The Terminology section of the Code defines "integrity" as "probity, fairness, honesty, uprightness, and soundness of character." Applying this definition, Rule 1.2 (A)'s reference to the integrity of the judiciary means that judges are not above the law and must respect the law, because otherwise they cannot be trusted to apply the law honestly and fairly. The rule of law depends on such public trust. We do not expect judges to be perfect; judges are human. But we can and do expect them to be honest. The judiciary has no place for dishonest persons. And public confidence that judges are honest is particularly important given the place of the judiciary in our system of government: "The judiciary's authority . . . depends in large measure on the public's willingness to respect and follow its

25

decisions. As Justice Frankfurter once put it . . . , 'justice must satisfy the appearance of justice.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445-446 (135 SCt 1656, 191 LE2d 570) (2015) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (75 SCt 11, 99 LE 11) (1954)). Thus, for the judiciary to serve its constitutional role properly and for that function to be seen as legitimate, judges cannot be perceived to be dishonest or above the law.

Judge Coomer's conduct (as found by the Hearing Panel) that violates this standard of integrity also amounts to conduct undertaken in bad faith, the constitutional requirement that must be met in order for this Court to discipline Judge Coomer in this matter. As we explained in our prior opinion in this case, the concept of bad faith in this context generally encompasses at least two general characteristics: that the duty breached by the actor was known to that actor, and that the actor was acting with some self-interest or ill will. It certainly "must involve something more than negligence." *Inquiry Concerning Coomer*, 315 Ga. at 860 (6). As we explained, "[b]ad faith is not simply bad judgment or negligence, but

26

it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will." Id. (citation and punctuation omitted).

Given the overlap between this standard and the Code's Rule 1.2 (A), we will discuss these issues together with respect to each instance of Judge Coomer's conduct. The Hearing Panel found generally that "the Director proved by clear and convincing evidence that [Judge Coomer] knew that it was improper for him to put his interests and his family's interests ahead of his client's (or the public's) in each of these instances of misconduct — in other words, that he acted in bad faith." We also note that the Hearing Panel made clear that its findings of bad faith were based in significant part on personally observing Judge Coomer throughout days of in-person hearings, including his own testimony. This is the kind of finding to which we offer considerable deference. In general, we conclude that the Hearing Panel's findings of bad faith are supported by the evidence, and that Judge Coomer's actions violated

the standard set by Rule 1.2 (A).

(i)     *Dealings with Filhart*

Considering first Judge Coomer's dealings with Filhart, the Hearing Panel found clear and convincing evidence of bad faith in that based on the Hearing Panel's observations of Judge Coomer and Filhart, the Hearing Panel concluded that "Filhart was exploitable, [Judge Coomer] exploitative, and the predictable results of that mix were the exploitation of a trust-based relationship to further [Judge Coomer]'s interests to the detriment of Filhart's. Bad faith writ large."

The record contains evidence that can support these general findings of bad faith with respect to Judge Coomer's dealings with Filhart. Although Judge Coomer has emphasized that the Hearing Panel did not find that he actually intended to distribute Filhart's assets in a manner other than that directed by Filhart, the Hearing Panel did make findings that Judge Coomer took advantage of Filhart's trust in order to position himself into a place of authority over Filhart's wealth. In particular, the Hearing Panel specifically

rejected Judge Coomer's representation that he considered Filhart to be a friend and never would have taken advantage of a friend, saying "the evidence does not support such a claim." Filhart's uncontradicted testimony made clear that he did not distinguish between when Judge Coomer was acting as his lawyer and when he was acting merely as a trusted friend. Regardless of Judge Coomer's subjective feelings toward Filhart, evidence in the record showed that Judge Coomer had limited social contact with Filhart, interacting with him more as a lawyer than as a friend. And the notion that Filhart was "exploitable" is supported by the evidence that Filhart had few friends and no family close by and was relatively isolated socially.

The Hearing Panel's findings of bad faith with respect to Judge Coomer's dealings with Filhart generally are bolstered by findings of bad faith regarding particular actions by Judge Coomer. With respect to the September 2018 loan from Filhart, the Hearing Panel found that the evidence about the loan transactions showed bad

faith "res ipsa loquitur,"[12] noting that the transactions were "[u]nsecured, unguaranteed loans[.]" The Hearing Panel did not clearly err in finding that Judge Coomer acted in bad faith in accepting an unsecured, unguaranteed loan from Filhart based on the nature of the transaction itself.[13] Moreover, Judge Coomer's explanation for the loan — that it was offered by Filhart as a way to encumber some of his funds until his Teamsters' pension fund was

[12] Judge Coomer argues that this was an improper application of the tort law concept of res ipsa loquitur. But we take the Hearing Panel's use of this term not as a reference to tort law, but as a finding that the terms of the estate-planning and loan documents themselves were evidence of bad faith.

[13] In reaching this conclusion, we do not rely on several aspects of the Hearing Panel's characterization of the loan. Specifically, we need not and do not rely on the Hearing Panel's characterization of the loan as "unconscionable," which Judge Coomer argues is both factually and legally erroneous and a violation of his due process rights in that he "had no notice before trial that an unconscionability claim was at issue." The Hearing Panel also generally described the loans from Filhart to Judge Coomer as "from client to lawyer/judge" in finding that the loans inherently were taken in bad faith. But the Hearing Panel's second Report and Recommendation was unclear as to whether the Hearing Panel had found that Filhart was a client of Judge Coomer at the time Judge Coomer accepted the September 2018 loan, at another point describing Filhart as a "former client" when discussing Judge Coomer's acceptance of "another unconscionable loan" from him; we therefore do not assume that Filhart was a client at the time of the September 2018 loan. And the Hearing Panel generally described the loans from Filhart as having "maturity dates that far exceed expected lifespans"; prior loans from Filhart to Judge Coomer, before he became a judicial candidate, had maturity dates of 2038 and 2048, but such a description would not appear to apply to the September 2018 loan.

expected to become insolvent — is undermined by the evidence that Filhart needed to liquidate stock holdings (ultimately with adverse tax consequences) in order to fund the loan.[14] The loan was a substantial one that would not come due until Filhart was in his eighties. That loan formally was provided to an entity that was controlled by Judge Coomer but itself had little to no assets, and the loan was unsecured and not guaranteed by Judge Coomer personally. And at the time the loan was accepted, Judge Coomer was the executor and trustee under Filhart's will. Because the loan was unsecured and not guaranteed, and provided to an entity that itself had assets insufficient to cover the loan, any collection of the debt was doubtful, and so Judge Coomer would have had the power to forgive the loan in the event of Filhart's death. See OCGA § 53-12-261 (b) (22) (C) (trustee's powers include the power "[t]o compromise all debts, the collection of which are doubtful, belonging to the estate or trust when such settlements will advance the

_____

[14] Filhart testified at the hearing that he could not remember whose idea the loan was.

31

interests of those represented").

The Hearing Panel's findings of bad faith in Judge Coomer's September 2018 estate-planning work for Filhart also have support in the record. The Hearing Panel found that prior wills that gave Judge Coomer authority to allocate Filhart's estate to Judge Coomer himself, and decide how much of the outstanding loan balances owed by Judge Coomer should be forgiven, also showed bad faith on their face. Exchanging Judge Coomer's wife for Judge Coomer as executor and trustee in the September 2018 will (the estate-planning work by Judge Coomer that actually came within the time period during which he was governed by the Code of Judicial Conduct) did not impress the Hearing Panel, which suggested that this merely showed that Judge Coomer understood the law ("no negligence here," the Hearing Panel opined). The Hearing Panel found that the will was particularly "damaging" to its view of Judge Coomer in that it also showed "his unwillingness, even after his judicial appointment, to relinquish control of Filhart as a source of potential financial gain." In addition, the Hearing Panel found

32

"unpersuasive" Judge Coomer's testimony that it was Filhart's idea to name Judge Coomer's wife as the new executrix and trustee in Filhart's will; the Hearing Panel's finding is supported by the testimony of Filhart and Judge Coomer's wife in contravention of the testimony of Judge Coomer himself. Even under the new will, a member of Judge Coomer's immediate family had the power to forgive the balance on the September 2018 loan in the event of Filhart's death; assuming Judge Coomer would have an incentive to forgive the balance on a loan to an unfunded entity controlled by him (and that he did not personally guarantee), his wife would have similar incentives to do so. And although Judge Coomer's wife testified that she would have consulted a lawyer friend, rather than her husband, if she had questions about her duties as executor and trustee, she also testified that at the time the September 2018 will was executed, she had not spoken to Filhart about his wishes for his assets and instead had received information on that point only from her husband.

The Hearing Panel's findings of bad faith in Judge Coomer's

interactions with Filhart after their relationship began to deteriorate also are supported by the record. In that regard, the Hearing Panel found:

> Bad faith similarly permeated [Judge Coomer]'s failure to provide Filhart with billing records and his case file, as well as [Judge Coomer]'s false claims about his knowledge of Filhart's plans to sell stock to fund one of the loans Filhart made to [Judge Coomer]. These actions . . . were made knowingly and with the intent to either obstruct or bring to a halt Filhart's efforts to learn more about what [Judge Coomer] had done with all the money Filhart had paid for legal services. Put differently, it was in [Judge Coomer]'s interest, as a newly minted appellate judge, to have Filhart the Gadfly go away and these professionally improper actions furthered that interest.[15]

Judge Coomer now acknowledges that he "should have given Mr. Filhart file records sooner." And yet at the time that it mattered, Judge Coomer dodged Filhart's requests for documents, insisting instead that Filhart had to give proof of mental competence.[16] And

---

[15] Although the Hearing Panel also found that these actions were "clear violations of duties [Judge Coomer] owed to Filhart[,]" we need not and do not decide whether that conclusion is correct.

[16] The Hearing Panel declined to conclude that Judge Coomer violated Rule 1.2 (A) by demanding that Filhart provide documentation of his mental health status. But we consider evidence of such in determining whether the Hearing Panel erred in finding that Judge Coomer acted in bad faith by refusing to give Filhart requested documents.

the Hearing Panel's finding that Judge Coomer misrepresented his purported ignorance of Filhart's liquidation of stock to fund the September 2018 loan when Filhart brought it up later also is supported by the record, notwithstanding Judge Coomer's attempts to argue that his response to Filhart was accurate in the narrow, literal sense that Judge Coomer was aware that Filhart had *considered* selling the stocks but not that he had actually done so.[17]

---

[17] Although Judge Coomer now suggests that it was literally true for him to say he "didn't know anything about that" because he was responding to Filhart's statements about Judge Coomer persuading him to sell his stocks and incurring a tax liability due to the stock sale, the Hearing Panel's interpretation of this dismissive statement as simply feigning ignorance of Filhart's plan to sell stock to finance the loan is not clearly erroneous. And the Hearing Panel's finding that Judge Coomer knew that Filhart planned to sell stocks to finance the loan also is not clearly erroneous.

Judge Coomer emphasizes that the Hearing Panel's first Report and Recommendation said at various points that he did not act with "dishonesty, deceit, and misrepresentation" in his dealings with Filhart, and that the Hearing Panel's second Report and Recommendation incorporated those findings by reference. Judge Coomer is not wrong. But those statements in the first Report and Recommendation were narrow, and were specifically focused on applying the standard of GRPC 8.4 (a) (4), not making broader and more general observations about Judge Coomer's integrity in his dealings with Filhart. And the second Report and Recommendation brought more clarity to the Hearing Panel's general view that Judge Coomer acted without integrity in his dealings with Filhart. As noted above, the Hearing Panel generally found that Judge Coomer's dealings with Filhart amounted to "the exploitation of a trust-based relationship to further [Judge Coomer]'s interest to the detriment of Filhart's." Also noted above, the Hearing Panel specifically referred to Judge Coomer's claims that he did not know about Filhart's plans to sell stock to fund a loan to Judge Coomer as "false."

In the light of the Hearing Panel's supported factual findings of bad faith by Judge Coomer in his dealings with Filhart, we conclude that these actions violated Rule 1.2 (A) of the Code of Judicial Conduct. While his application for an appellate judgeship was pending, Judge Coomer accepted a substantial, unsecured loan from a vulnerable person who trusted him, against the backdrop of a will that gave Judge Coomer considerable authority over Filhart's estate. After it was announced that Judge Coomer would be appointed to the bench, he did not attempt to extricate himself from Filhart's affairs by paying off the loan, or by suggesting a new lawyer to draft a new will that removed Judge Coomer's family from those who stood to benefit. Rather, Judge Coomer himself drafted a new will for Filhart that maintained Judge Coomer's status as a beneficiary, an act that Judge Coomer admits violated GRPC 1.8 (c). Although the new will removed the executor and trustee positions from Judge Coomer, it did not remove them far; instead, it merely turned those roles over to his wife. When Filhart later became disenchanted with Judge Coomer and sent him an angry e-mail

about the stock sale, Judge Coomer disingenuously feigned ignorance about the stock transaction. He did not offer to repay two loans early at that time, instead waiting to pay those off until April 2020, after Filhart had sued him. And when Filhart asked for various documents, Judge Coomer continued to stall. These actions do not "promote[ ] public confidence in the . . . integrity . . . of the judiciary"; rather, they undermine such public confidence. These actions present to the public a picture of a judge who will abuse a position of trust in order to take advantage of a vulnerable person for his own personal financial benefit. They present a picture of a judge who, when confronted with the consequences of those actions, does not cooperate or try to rectify his wrongs, but stalls and obfuscates. And they present a picture of not mere negligence, but conscious wrongdoing motivated by self-interest, and thus actions taken in bad faith.

(ii)  *Hawaii Trip*

Judge Coomer's handling of campaign-finance matters undermined public confidence, too. The Hearing Panel said it could

37

easily find bad faith in Judge Coomer's handling of financing of the Hawaii trip, as he admitted that he understood prior to planning the trip that applicable rules forbid using campaign funds for personal or family travel expenditures. As the Hearing Panel found, Judge Coomer "put self-interest ahead of his obligation to obey the law[.]" These findings of bad faith in Judge Coomer's handling of financing of his Hawaii vacation find sufficient support in the record. Judge Coomer does not seriously contest that it was permissible to use his campaign funds to pay for vacation expenses for his children. In particular, Judge Coomer offered testimony about an earlier trip to Israel — which took place in 2017, while he was a legislator but before he was governed by the Code of Judicial Conduct — that his "intent was, at all times, to reimburse the campaign for" money spent on his children's airfare for that trip, showing that he knew prior to the Hawaii trip that the use of campaign funds for personal leisure was forbidden. Although Judge Coomer did partially reimburse his campaign for the Hawaii trip soon after taking it, the record shows that he did not fully reimburse his campaign until after

the CFC began investigating him for possible campaign finance violations. And there is no dispute that Judge Coomer failed to disclose clearly the Hawaii trip as a campaign expenditure, merely listing it as a credit card charge, demonstrating an attempt to conceal these improper expenditures.

In the light of the Hearing Panel's findings about the Hawaii trip, we conclude that Judge Coomer's actions in this regard violated Rule 1.2 (A) of the Code of Judicial Conduct. Essentially, Judge Coomer floated himself a loan from his campaign funds to pay for a family leisure trip, while knowing from the outset that it was impermissible to pay for such expenses with those funds, and compounded the violation by failing to disclose it despite his knowledge that disclosure was required. He did not reimburse his campaign account fully until the CFC began investigating him, adding to a pattern of failing to rectify his mistakes until it served his own interests to do so. These actions, especially when combined with all the rest of his self-interested conduct, present to the public a picture of a judge who will bend the rules and abuse the access to

39

campaign cash that a public office affords him when it benefits him financially.

(iii) *Law Firm Transfers*

The Hearing Panel's finding that Judge Coomer's failure to report transfers of campaign funds to his law office account involved bad faith also is supported by the record. The Hearing Panel found that Judge Coomer acted in bad faith because he "knew of his statutory obligation to account for the movement of funds into and out of his campaign account." The Hearing Panel supported its finding that Judge Coomer knew of his obligation to report such by noting that Judge Coomer did report one such transfer that occurred within a week of the two that he did not report. This reporting failure also violated Rule 1.2 (A) of the Code of Judicial Conduct. These actions, especially when combined with all the rest of his self-interested conduct, present to the public a picture of a judge who will not honestly account for his handling of campaign cash, and thus cannot be trusted to handle judicial matters before him with

honesty and integrity.[18]

*

In sum, in addition to the Rule 1.1 violations we already have discussed, we conclude that Judge Coomer's various actions as found by the Hearing Panel also violated Rule 1.2 (A) of the Code of Judicial Conduct, in that they undermined "public confidence in the . . . integrity . . . of the judiciary." We also conclude that the record generally supports the Hearing Panel's findings that Judge Coomer undertook the conduct at issue in bad faith, including the conduct that we have found constitutes a violation of Rule 1.1 and/or Rule 1.2 (A).

And, based on the factual findings that we have upheld, we agree that Judge Coomer's actions were "prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const. Art. VI, Sec. VII, Par. VII (a). Therefore, it is

---

[18] In reaching this conclusion, we assign no weight to the Hearing Panel's repeated characterization of campaign funds as being held in "public trust." Campaign funds are not held in public trust; they simply have statutory limitations on permissible uses.

within our constitutional power to sanction Judge Coomer.

(d)  *Removal is the appropriate sanction.*

That conclusion brings us to the question of the appropriate sanction. As we said before, this is a close case from an evidentiary perspective; the evidence may very well have supported different findings, especially as to bad faith. But having determined that the relevant findings that the Hearing Panel made are supported by sufficient evidence, our decision about the proper sanction is not a difficult one. The Hearing Panel's findings that we have determined were not clearly erroneous show that Judge Coomer has exploited a vulnerable person, has repeatedly violated campaign finance rules and flouted professional norms, and has done so knowingly and for his own personal financial benefit. By demonstrating a pattern of refusing to comply with the law and professional norms when noncompliance was in his interest, he has undermined the public's trust in his ability to follow and apply the law honestly and fairly in cases that come before him. And he was dishonest and exploitative in his dealings with a vulnerable person, a quality that is flatly

42

incompatible with being a judge. Accordingly, his continued service would undermine the public's confidence in the judicial system as a whole. Based on all of these aspects of Judge Coomer's actions, we conclude that removal is the appropriate sanction.

This conclusion accords with our precedent. We have removed a judge whose actions show a disregard of the law for personal benefit. See *Matter of Inquiry Concerning a Judge No. 491*, 249 Ga. at 31-32 (removing justice of the peace who pleaded nolo contendere to assisting relative in fraudulent obtainment of welfare benefits). We also have removed a judge for taking advantage of a vulnerable person, even where the judge's actions were taken in his personal capacity, on the ground that "the deception and over-reaching practiced against" that vulnerable person "was odious conduct, and diametrically opposite from the commands of the" Code of Judicial Conduct. See *Matter of Inquiry Concerning a Judge No. 1305*, 259 Ga. 640, 642-643 (4) (b) (388 SE2d 328) (1989) (removing probate judge who schemed to terminate employment of decedent's housekeeper in order to increase share of decedent's estate that

43

judge and his wife would inherit). And we have removed a judge for making false claims, as the Hearing Panel found that Judge Coomer made to Filhart. See *Matter of Inquiry Concerning Judge Robertson*, 277 Ga. 831 (596 SE2d 2) (2004) (removing judge who, in filing to run for an elected magistrate judge position, submitted an affidavit falsely stating that he had never been convicted of a felony involving moral turpitude).

Our decision to remove Judge Coomer is also informed by his response to the JQC inquiry. Of course, a judge faced with an ethics investigation by the JQC has every right to defend himself. He can argue that his actions do not violate a particular statute or rule, including the Code of Judicial Conduct. He can disagree with JQC staff or the Hearing Panel as to appropriate sanctions. He can dispute the factual accuracy of the allegations against him. And judges must be free to do all of those things without fear that a sanction will be worse if they simply fail to prevail.

But judges cannot be misleading during that process, any more than lawyers can be misleading during State Bar disciplinary

44

processes. See Rule 1.2 (A) ("Judges shall act at all times in a manner that promotes public confidence in the . . . integrity . . . of the judiciary."); see also *In the Matter of Mays*, 269 Ga. 100 (495 SE2d 30) (1998) (disbarring attorney for various rules violations after considering that lawyer was misleading during the State Bar disciplinary proceedings).[19]

Here, the Hearing Panel found multiple instances in which Judge Coomer was disingenuous, if not outright dishonest, in his testimony or the positions that he took before the Hearing Panel. Although Judge Coomer testified in broad terms that he considered Filhart a friend and "had no interest in doing anything wrong or bad to him or . . . using his assets in some way he didn't want them used[,]" the Hearing Panel found that "the evidence does not support such a claim." More specifically, the Hearing Panel found

---

[19] We recognize that imposing discipline on a judge solely based on the judge's response to a JQC inquiry, without the JQC first filing formal charges against the judge alleging such conduct constituted a violation of the Code of Judicial Conduct, might raise due process concerns. This case does not present that scenario, however. Having already concluded that Judge Coomer violated several provisions of the Code of Judicial Conduct through his actions before the JQC inquiry, we consider his actions during the JQC process as an aggravating factor only in determining the proper sanction.

"unpersuasive" Judge Coomer's testimony that it was Filhart's idea to name Judge Coomer's wife as executrix, testimony inconsistent with the testimony of Filhart and Judge Coomer's wife. And, as discussed above, regarding transfers from Judge Coomer's campaign account that ultimately went to his legal assistant, although the Hearing Panel said that it did "not doubt that [Judge Coomer]'s assistant helped him with legislative work[,]" it appeared to question the veracity of Judge Coomer's claim as to the specific amounts at issue.

Judge Coomer argues that the Hearing Panel failed to consider evidence in mitigation. In particular, he notes his public service and his lack of disciplinary record in those various positions. He also emphasizes "[h]is always timely payments to Mr. Filhart; his attempts to balance his personal, law firm, and campaign finance accounts; his early pay-off of the last two notes to Mr. Filhart; his prompt resolution of campaign finance issues with the CFC; his inexperience with the ethical and campaign finance issues he faced; his compliance with civil penalties imposed by the CFC; his prompt

resolution of Mr. Filhart's lawsuit; and the isolated, remote nature of the conduct with no chance of repetition[.]" He also argues that his expressions of remorse — in the form of admissions to *some* mistakes — and the fact that he already has served a lengthy suspension should serve in mitigation — with no acknowledgment that the suspension has been with full pay.

But regardless of the extent to which the Hearing Panel considered these factors,[20] the question of whether Judge Coomer should be removed from office is ultimately one for this Court. See Ga. Const. of 1983, Art. VI, Sec. VII, Par. VIII; see also *Inquiry Concerning Coomer*, 315 Ga. at 847 (3) ("[T]his Court reaches its own conclusions regarding disciplinary sanctions against a sitting judge,

---

[20] The Hearing Panel clearly considered some of these things, noting in its initial Report and Recommendation that "[i]n reaching its recommendation of removal, the Hearing Panel has also considered that [Judge Coomer] has no prior disciplinary record, that he was somewhat cooperative in the JQC and CFC disciplinary proceedings, and that some who know him view him as a man of 'good Christian character.'" Moreover, it clearly saw some aspects of Judge Coomer's case very differently than he characterizes them in arguing that there are mitigating factors; the Hearing Panel described Judge Coomer's behavior as a "long and unbroken pattern of violating multiple attorney ethics rules and campaign finance laws to his own financial benefit" and noted that Judge Coomer at his hearing "insisted that his mistakes were few and harmless."

47

and the recommendations of the Hearing Panel are not binding upon us." (citation and punctuation omitted)). In evaluating that question, we have considered Judge Coomer's history of public service,[21] the nature of the conduct at issue, and Judge Coomer's behavior during the JQC inquiry.[22] We conclude that removal is the appropriate sanction. Accordingly, it is ordered that Judge Christian Coomer of the Court of Appeals of Georgia be removed from office,

---

[21] We have considered Judge Coomer's history of public service, including his having served honorably in the military. See *Inquiry Concerning Norris*, 314 Ga. at 15 (2) (noting that JQC Hearing Panel considered, among other mitigating factors, respondent judge's "long record of 'honorable public and military service'" and that "'this case appears to have been a lone (but significant) incident'"); *Inquiry Concerning Hays*, 313 Ga. at 150 (noting among other mitigating factors that respondent judge served "honorably" in the military and "lacks a prior disciplinary history"). But we do not ascribe much weight to his lack of a lawyer disciplinary record, something we do not appear to have relied on explicitly in prior judicial discipline cases. Indeed, few lawyers with a public disciplinary record are likely to receive subsequent judicial appointments. To the extent that Judge Coomer asks us to consider his lack of prior *judicial* discipline, this point carries little, if any, mitigating force, given that Judge Coomer scarcely had time to commit any other violations. The allegations span Judge Coomer's entire time as a candidate for the Supreme Court and the Court of Appeals up to the time the charges were filed, and the considerable majority of his service on the Court of Appeals, and he was suspended from office in this proceeding after less than two and a half years on the bench.

[22] We do not consider the statewide nature of Judge Coomer's judgeship as either a mitigating or an aggravating factor. The Hearing Panel argued that the statewide nature of his judgeship warranted punishment harsher than if he had been a trial judge with limited geographic jurisdiction. But there is one Code of Judicial Conduct, and it applies to all judges equally.

effective upon disposition of any motion for reconsideration filed pursuant to this Court's Rule 27, or upon the expiration of the time for filing such a motion without any such motion having been filed. As a result of this order, Judge Coomer "shall not be eligible to be elected or appointed to any judicial office in this state until seven years have elapsed" from the date of this order. OCGA § 15-1-13 (a).

*Removed from office. All the Justices concur, except Bethel, J., not participating, and Colvin, J., disqualified.*

Decided August 16, 2023.

Judicial discipline.

*Charles P. Boring, Courtney M. Veal, Anna G. Cross, Meredith C. Kincaid*, for Judicial Qualifications Commission.

*Copeland Stair Valz & Lovell, Mark D. Lefkow; Cathey & Strain, Dennis T. Cathey; Stites & Harbison, Johannes S. Kingma*, for Coomer.