**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: November 7, 2023

S23Y0437.  IN THE MATTER OF WALTER DOUGLAS ADAMS.

PER CURIAM.

This disciplinary matter arises from a fee dispute between Walter Douglas Adams (State Bar No. 004650) and his former, long-time client. In December 2022, this Court received a report and recommendation of the State Disciplinary Review Board (the "Review Board"), which reviewed the report and recommendation of the Special Master, Jack J. Helms, Jr., at the request of Adams pursuant to Bar Rules 4-214 and 4-216. In its report, the Review Board adopted the Special Master's findings of fact and conclusions of law and agreed that Adams, who has been a member of the State Bar since 1980, was in default[1] and should be suspended from the

---

[1] On September 10, 2020, the State Bar filed its formal complaint. While Adams acknowledged service of the formal complaint, he failed to file a timely answer or obtain an extension of time to file an answer, and the Special Master

practice of law for six months and provide restitution totaling $2,732.81 to his former client based on his violations of Rules 1.4, 1.5, 1.15 (I), 1.15 (II) (a) and (b), 1.16, and 9.3 of the Georgia Rules of Professional Conduct ("GRPC" or the "Rules") found in Bar Rule 4-102 (d).[2] On April 18, 2023, we issued an order remanding the matter back to the Special Master. While we did not agree with Adams that the Special Master erred in granting default judgment given Adams's failure to satisfy the requirements of Bar Rules 4-212 (b) and 4-221 (b) and OCGA § 9-11-55 (b), we ordered the Special Master to clarify his findings of fact and conclusions of law, to include citations to case law that supported his recommended level of discipline, and to revise his report and recommendation consistent with this Court's order.

---

ultimately granted the State Bar's Motion for Default and ruled against Adams's Motion for Relief from Default. Nevertheless, the Special Master offered Adams an in-person meeting as he requested to allow him to provide input on the appropriate level of discipline, see Bar Rule 4-213.

[2] The maximum penalty for a violation of Rules 1.4, 1.5, 1.16, and 9.3 is a public reprimand, while the maximum penalty for a violation of Rules 1.15 (I) and (II) (a) and (b) is disbarment.

The Special Master held a second evidentiary hearing with Adams and filed this amended report and recommendation in which the Special Master now asks the Court to disbar Adams and order that he make restitution based on his violations of the Rules. Adams has filed exceptions to the revised report and requests review by the Review Board,[3] and the State Bar has filed a response. Having reviewed the record, we agree with the Special Master that Adams has violated Rules 1.4, 1.5, 1.15 (I), 1.15 (II) (a) and (b), 1.16, and 9.3. However, we disagree that disbarment is warranted under these particular facts and instead impose a one-year suspension, which is more consistent with our disciplinary precedent.

    1. *The Special Master's Report and Recommendation*

---

[3] While Adams requests review by the Review Board, we already addressed the appropriate filing procedure to follow by directing in our remand order that the Special Master filed his revised report directly with this Court's Clerk's Office, and that Adams and the State Bar could file any such exceptions in this Court pursuant to Bar Rule 4-218. Thus, we deny Adams's request. Importantly, we note that in our remand order, we did not vacate the previous report and recommendations of the Special Master and Review Board, compare *In the Matter of Farnham*, 312 Ga. 65, 70-71 (860 SE2d 547) (2018), which, consequently, might have permitted Adams to file exceptions before the Review Board before the disciplinary matter was again brought before this Court. See Bar Rule 4-214 (c) and (d).

a) *Findings of Fact*

By virtue of Adams's default, and thus his admission of the statement of facts in the formal complaint, and after two evidentiary hearings, the Special Master made the following findings. Since November 2013, Adams has agreed to represent a client in several matters. On November 15, 2013, Adams and the client signed a written contingency fee contract for him to represent her in a claim for "improper items on credit reports." He also represented the client in a personal injury matter, and while he did not have a written contingency fee agreement to handle that matter, the settlement statement, signed August 19, 2016, showed that Adams took a one-third contingency fee from the proceeds of that matter, plus expenses. In both matters, Adams successfully represented the client, and she was satisfied with the results. Beginning in 2015, Adams also agreed to represent her in a second credit report matter against credit reporting agency Trans Union LLC. Adams did not have a written contingency fee agreement with the client to handle the Trans Union matter or any other written communication with

4

her as to how he would be paid. The client believed that Adams was handling the Trans Union matter on a contingency fee basis, and Adams did not require her to pay him a retainer or provide her with any bills for time expended or expenses incurred in the Trans Union matter.

After the federal district court denied Trans Union's motion to dismiss, Trans Union offered $7,000 to settle the case. Adams then communicated to the client that he had obtained a settlement offer that would yield her $1,500, and she informed Adams that she would accept such a settlement if that was all that Trans Union offered. Adams did not inform the client that the total settlement amount was $7,000 before she agreed to the lesser amount. And when she appeared at his office in December 2018 to sign the release to effectuate the settlement, she learned for the first time that the total amount was $7,000. Adams was not present at the time the client signed the release, and she believed he was mistaken that her share was only $1,500; however, Adams later spoke to her and informed her that he "had done considerably more work than the settlement

would produce in attorney[] fees than if [he] were paid on an hourly basis." Adams told her that she was only entitled to $1,500 and that he was going to keep the remainder, but she did not believe that it was fair for Adams to keep over 70% of the proceeds of the settlement.

The client decided that she no longer trusted Adams and asked him to give her the files for all of her cases, but Adams did not comply. In the meantime, Trans Union informed Adams that because the settlement check had not been issued in 2018, the client would have to sign "new W-9 forms" that reflected a settlement in 2019. When the client met with Adams to find out why it was taking him so long to give her the files, he asked her to sign the new W-9 forms. She refused to do so until she had reviewed all of her settlements with him, so she could understand how his attorney fees and expenses had been calculated, and he replied: "Those are old closed files, they are in storage, and I'm through with it." As Adams said this to the client, he put his right hand up in the air toward her and turned and walked away. Adams has never provided the client

6

with the files as requested, and she maintained her refusal to sign the W-9 forms. In his sworn response to the Notice of Investigation in this matter, Adams informed the State Bar that the client had not contacted him since.

In January 2019, the client filed her grievance with the State Bar, Adams filed a written response to the grievance, and the client filed a rebuttal. In May 2019, the State Bar sent a letter to Adams requesting a copy of his trust account record/ledger for all settlements involving the client, and regarding all transactions involving the client, his attorney-client agreements, settlement statements, and copies of cancelled checks disbursing the settlements. In response, Adams sent the State Bar a ledger card accounting for the settlement proceeds in the first credit report and personal injury matters, but Adams sent no documents accounting for the proceeds of the Trans Union matter. In addition, he sent the State Bar a copy of his contingency fee agreement in the first credit report matter, a copy of his settlement statement in the first credit report and personal injury matters, and a copy of his cancelled

7

checks disbursing proceeds in the first credit report and personal injury matters. However, Adams failed to send the State Bar a copy of any attorney-client agreement in the personal injury or Trans Union matters, a copy of any settlement statement regarding the proceeds in the Trans Union matter, or a copy of any cancelled check in the Trans Union matter.

In February 2020, the client received a Form 1099-Misc. tax form from Trans Union LLC memorializing that in 2019 the client received a settlement of $7,000 from Trans Union. When the State Bar asked Adams to account for the fact that the client received the 1099 Form (but received no such money), he replied in a letter:

> The total amount of the settlement was $7,000.00. Trans Union never paid anything to [the client] through my office. Trans Union never paid anything to me. [The client] has not received any of the $7,000.00. The check in the amount of $7,000.00 is payable to her and to me jointly. She did not return to my office, and therefore, I could not negotiate the check. I still have the check.

Counsel for the State Bar asked Adams to send him a copy of the check, and while Adams responded, he did not send a copy of the check. Counsel again asked via email for a copy of the check, and he

responded in a letter:

> I do need to correct a misstatement in my letter to you of August 12, 2020. I do have the check, which is made payable to me and it has never been cashed. . . . The check is from the law firm which represented Trans Union. . . . If you have any questions concerning this letter, please contact me.

Adams did not send a copy of the $7,000 check. However, he did send a $1,500 check to the Bar in September 2020 to forward to the client as payment of her portion of the settlement. As to his total expenses in the Trans Union matter, Adams stated in his August 12, 2020 letter that his "out-of-pocket expenses were Court costs of $101.50, and the bill for the Court reporter in the amount of $332.35." Adams initially claimed that he did not deposit the $7,000 check into his trust account or any other account, but after the supplemental hearing, Adams provided bank documents that reflect a deposit in October 2022 of the $7,000 check into his trust account and stated that this was done at the urging of the Review Board. A formal complaint was filed by the State Bar on September 10, 2020, and on June 15, 2021, the Special Master granted the State Bar's

Motion for Default due to Adams's failure to timely answer or obtain an extension of time to file an answer.

b) *Rule Violations*

By virtue of his default, the Special Master concluded that Adams violated the following Rules.

Adams violated Rule 1.4 (a) (1), by failing to communicate "information and explanation" regarding the $7,000 settlement in the Trans Union matter that was "adequate" for the client to give her informed consent to the settlement. He violated Rule 1.4 (a) (2) by failing to "reasonably consult with" the client about how the Trans Union matter would be resolved or inform her of the total amount of the Trans Union settlement and Rule 1.4 (a) (3) by failing to tell the client that her case settled for $7,000 when he asked her to accept $1,500.

Adams violated Rule 1.5 (a), insofar as he charged and intended to keep an unreasonable fee now that he has deposited the $7,000 check. He also violated Rule 1.5 (c) (1) by failing to put the contingency fee agreement in writing in regard to the personal

injury and the Trans Union matters, and in regard to the Trans Union matter, failing to state the method by which the fee was to be determined or state whether expenses were to be deducted before or after the contingency fee was calculated. He also violated Rule 1.5 (c) (2) by failing to provide the client with a written settlement statement.

For well over three years, Adams violated Rule 1.15 (I) (a) by failing to keep the Trans Union settlement proceedings intact in an IOLTA account. In addition, because Adams failed to pay any amount of the proceeds to his client (before he sent a $1,500 check to the State Bar in September 2020), he violated Rule 1.15 (I) (c). He further violated Rule 1.15 (I) (c) by failing to account to the client for the Trans Union settlement proceeds. Adams also violated Rule 1.15 (I) (d) by failing to keep the Trans Union settlement proceeds separate until there could be an accounting and severance of his interest versus the client's. In sum, Adams was required to promptly disburse to the client the portions of the Trans Union settlement proceeds not in dispute, but he did not do so or take any affirmative

steps to reconcile with the client, until 20 months later when he sent the State Bar a check for $1,500 – after two requests from the State Bar's Counsel and after a formal complaint had been filed against him.

Adams violated Rule 1.15 (II) (a) by failing to administer the Trans Union settlement proceeds from a trust account and Rule 1.15 (II) (b) by failing to keep and maintain trust account records on the settlement proceeds as required.

Adams violated Rule 1.16 (d), insofar as he failed to surrender to the client the portion of the Trans Union settlement funds to which she was entitled in a reasonable and timely manner and then only after a complaint was filed against him by the client. In addition, he violated this Rule by failing to surrender to the client her papers and her file from the first credit report matter, the personal injury matter, and the Trans Union matter. (f) Adams violated Rule 9.3 by failing to account to the State Bar for the proceeds in the Trans Union matter (until about three years later), provide the State Bar with the attorney-client agreement in the

12

personal injury or Trans Union matters, provide the State Bar with the settlement statement in the Trans Union matter, and provide the State Bar with any cancelled checks disbursing funds in the Trans Union Matter or documentation that the $7,000 check had been deposited until about three years later.

c) *The American Bar Association Standards of Imposing Lawyers Sanctions*

The Special Master determined that pursuant to the American Bar Association ("ABA") Standards for Imposing Lawyer Sanctions, the factors to consider in imposing a sanction for lawyer misconduct include the duty violated, the lawyer's mental state, the actual or potential injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors. The Special Master then determined that all of Adams's violations of Rules 1.15 (I) and (II) implicated ABA Standard 4.1 (failure to preserve client's property). As to Adams's mental state, the Special Master found the following. Adams acted with an intent to obtain a benefit by keeping an unreasonably large share of the $7,000 settlement through his

superior position of power and control by maintaining control over the money as the client's attorney and fiduciary. Adams refused to pay her anything until she agreed to his terms, and then paid her a portion of her funds only after a formal complaint was filed against him. His actions and refusal to cooperate fully demonstrated selfishness by attempting to advance his own interests over those of his client. Adams was given every opportunity to work with his client to resolve this dispute, but at every turn he doubled down on his refusal to take any responsibility or recognize that he violated his professional duties and responsibilities. In addition, his actions amounted to a gross abuse of his relationship with his client and a knowing and intentional abuse of his fiduciary position. Adams "again and again" failed to handle the disputed funds appropriately. See generally GRPC 1.15 (I) Comment [3A] ("In those cases where it is not possible to ascertain who is entitled to disputed funds or other property held by the lawyer, the lawyer may hold such disputed funds for a reasonable period of time while the interested parties attempt to resolve the dispute. If a resolution cannot be reached, it

14

would be appropriate for a lawyer to interplead such disputed funds or property.").

Regarding injury, the Special Master determined that at a minimum, the client suffered the injury of having to wait almost two years for Adams to deliver to her the $1,500 that he did not dispute. Adams repeatedly refused to recognize his duties to his client as a professional with an intent to use his superior position to deprive his client of a fair division of fees. According to the Special Master, Adams still refuses to admit that the proposed division of the settlement funds and his handling of the affairs ran afoul of his duties under the GRPC, and indeed, he continued to assert that the client suffered no loss in this case.

Next, the Special Master concluded that Adams's violations of Rule 1.4 violated his duty of diligence to the client. The Special Master concluded that Adams deliberately omitted mention of the amount of recovery to the client until after he told her how much she would receive from the settlement; that, while he was not present, he had his secretary oversee the client signing the release that for

the first time informed the client of the total settlement amount; and that after she disputed the amount she was to receive, he abruptly cut off communication with her and took no further action toward the client until he sent the State Bar the $1,500 check in September 2020 in response to the Formal Complaint. The Special Master also found that it was not until June 2023 that Adams represented to the Bar that he had placed the check in his trust account in October 2022 at the urging of the Review Board and was holding it until this matter could be resolved. As to his mental state, the Special Master concluded that Adams acted with intent when he abused his duties to communicate with the client in violation of Rule 1.4 because he had not been completely candid or forthcoming with his client about the settlement negotiations, the division of fees or her property based on the final amount of the settlement, and he admitted at the supplemental hearing that he had not sent the client any portion of her settlement or made any effort to do so, until after a formal complaint was lodged against him. The Special Master opined that a simple phone call or letter or other effort may have easily headed

16

off this whole dispute; instead, the Special Master opined, Adams "dug in his heels" and to this day maintains that he has not caused any harm to his client, the public at large, or the profession. The Special Master concluded that Adams knowingly engaged in conduct that caused injury to his client due to the delay in her obtaining some portion of the settlement and that he had done next to nothing to remedy the injury in the interim.

Finally, the Special Master concluded that Adams's violations of Rules 1.5, 1.16, and 9.3 implicated ABA Standard 7.0 (violations of duties owed as a professional) because he engaged in misconduct with the "intent to obtain a benefit" for himself – that is, to keep an unreasonably large share of the $7,000 and to frustrate or avoid an investigation by the client or the State Bar as to what happened with the $7,000, and the client was injured by this conduct as already described above. As to his mental state, the Special Master found that Adams's failure to provide the client with a settlement statement and her files in violation of Rules 1.5 (c) and 1.16 (d) was done intentionally. The Special Master determined that Adams still

17

had not provided any documents or records that justified how he decided to divide the ultimate settlement of $7,000.

Moreover, the Special Master determined that Adams's violation of Rules 1.5 (a) and (c), 1.16 (d), and 9.3 injured the public and the legal profession insofar as any callous disregard of those rules undermined the efforts, and indeed the reputation, of every Georgia lawyer who abided by the rules while Adams did not. Accordingly, the Special Master concluded that Adams's violations implicated ABA Standard 7.1 ("Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.").

*Factors in Aggravation*. The Special Master found that the following aggravating factors applied here. Adams had a dishonest or selfish motive. See ABA Standard 9.22 (b). He acted with intent to deceive the client as to the settlement and how to divide the money sent to him, and intentionally failed to comply with the

18

disciplinary process. See, e.g., *In the Matter of Davis*, 311 Ga. 797 (860 SE2d 467) (2021) (disbarring lawyer who did not respond to client's letter requesting a refund and otherwise abandoned client, who did not respond to the grievance the client filed with the State Bar, and who had a dishonest and selfish motive); *In the Matter of Arrington*, 308 Ga. 486, 487 (841 SE2d 663) (2020) (disbarring lawyer who hid misconduct and "intentionally failed to comply with the disciplinary process" and acted "willfully, dishonestly, and with a selfish motive"). Adams also committed multiple offenses, as he violated six Rules and multiple paragraphs within each Rule. See ABA Standard 9.22 (d); *In the Matter of Coulter*, 304 Ga. 81, 85 (816 SE2d 1) (2018) (lawyer's many rule violations in a trust accounting case with a single client constituted multiple offenses under ABA Standard 9.22 (d)). Adams has at times obstructed the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency, see ABA Standard 9.22 (e), and this is a significant aggravating factor as it shows that Adams has consistently refused to take the client's grievance and disciplinary

19

process seriously and to act with the utmost urgency given the gravity of the proceedings. See, e.g., *In the Matter of Harris*, 301 Ga. 378, 379 (801 SE2d 39) (2017) (disbarring attorney and noting that he ignored the gravity of the proceedings by his failure to respond). While Adams did make some efforts to respond early on to the complaint, he did not timely respond to the complaint, and he made no effort to follow up as he should have to rectify his failure to timely answer. To compound these offenses, Adams belatedly, and only after prodding from the State Bar and Review Board, provided some money to the client and finally produced banking records regarding the $7,000 check. Finally, Adams has persistently failed to acknowledge the wrongful nature of his conduct, see ABA Standard 9.22 (g); has substantial experience in the practice of law, see ABA Standard 9.22 (i); and has shown indifference to making restitution, see ABA Standard 9.22 (j), as his payment to the client was both untimely and inadequate.

*Factors in Mitigation.* The Special Master found only one factor in mitigation, which was that Adams had no prior disciplinary

20

record. See ABA Standard 9.32 (a).

d) *The Special Master's Recommendation*

While initially recommending a six-month suspension plus restitution, "after careful consideration of [this] Court's remand and instructions," persuasive arguments of the State Bar, and Adams's position in this matter, the Special Master determined that the correct recommendation was disbarment. The Special Master stated that this conclusion came with "some reluctancy and hesitancy," but found that when applying the considerations and criteria as outlined in prior case law with somewhat "similar facts" and given Adams's conduct, there was no other conclusion. As an additional sanction, see ABA Standards, III (B) (2.8) (a), the Special Master determined that the great weight of the evidence, including the two prior matters Adams handled for the client, showed that Adams and the client had a contingency fee agreement for 33.33% with expenses to be reimbursed to Adams. Thus, the Special Master concluded that restitution in the amount of $2,732.81 was due to the client; out of the $7,000 settlement, this was the net figure due to the client after

deduction of expenses of litigation, the $1,500 Adams already paid to her, and Adams's 33.33% fee.

2. *Adams's Exceptions to the Special Master's Report*

Adams has filed exceptions to the Special Master's report in this Court. In his exceptions, he requests review by the Review Board of the Amended Report pursuant to Bar Rule 4-216 (d). He also claims that the Special Master failed to address pertinent evidence in the record and made factual findings that are not supported by the record.

In addition, regarding the Rule 1.5 (c) (1) violation, Adams claims that while the Special Master found a violation because the personal injury case contract was not in writing, the Special Master also acknowledged that the client was satisfied with his representation in that case, and information regarding disbursements had been furnished to the State Bar. And while the Special Master faults Adams for not having a written contingency fee agreement in the Trans Union matter, Adams claims that he has testified that he never would have taken this case on a contingency

fee basis because there was no evidence of actual damage. He also claims that the Special Master has exceeded his authority by ordering that Adams pay the client restitution and that the "tenor" of the amended report also raises questions of "bias."

Moreover, Adams contends that there were three errors of law, including: (1) the finding that he was in default; (2) the Special Master's consideration of conduct that occurred after the June 12, 2020 formal complaint, which constituted a due process violation; and (3) the Special Master's finding that Adams had converted funds, even though the formal complaint made no such allegation and there was no evidence of conversion.

Finally, Adams claims that a number of cases show that the Special Master committed an error in his recommendation of discipline.[4] See e.g., *In the Matter of Hamilton*, 315 Ga. 821, 824-825, 830-831 (884 SE2d 887) (2023) (six-month suspension imposed

---

[4] In his report, the Special Master alluded to the cases cited by Adams and stated that they did not support leniency as they all involved some element of remorse, acknowledgement of wrong, complete cooperation with the investigative process, or full restitution to the client.

23

where attorney with several prior disciplines and who filed petition for voluntary discipline failed to return an unearned fee and made false statements in a sworn answer to the complaint); *In the Matter of Cook*, 311 Ga. 206, 215-216, 218-219 (857 SE2d 212) (2021) (review panel reprimand, rather than two-year suspension recommended by Review Board, where there were multiple disbursements of trust account funds before fees received, but in mitigation there was no allegation that attorney failed to adequately or competently represent a client); *In the Matter of Johnson*, 302 Ga. 865, 866-867 (809 SE2d 797) (2018) (accepting petition for voluntary discipline and imposing a six-month suspension where client funds were put into operating account and trust account funds were used to pay personal bills).

In sum, Adams requests a reprimand, pointing to the fact that he has not previously been subject to any disciplinary action; the State Bar took a considerable amount of time to file a formal complaint; the member of the State Disciplinary Board appointed to investigate this matter never contacted him; the formal complaint

24

was not filed within 30 days of the time that the Review Board found probable cause of violations of the Rules; and the complaint includes numerous assertions of conduct which had not occurred before the Review Board made its decision.

3. *The State Bar's Response to Adams's Exceptions*

The State Bar has responded to Adams's exceptions and contends that the cases he cites are all fundamentally different either on a procedural or substantive basis or both. Moreover, the Bar has determined that in many of the cases, the respondents had shown some level of timely remorse, acknowledged wrongdoing, acted unintentionally, cooperated with the disciplinary process, presented significant mitigating circumstances, or provided restitution. And, here, it contends that the Special Master correctly recommended disbarment as the appropriate discipline based on relevant case law. See *Davis*, 311 Ga. at 798-799 (disbarment warranted where attorney who failed to respond to disciplinary authorities violated Rules 1.2 (a), 1.3, 1.4, 1.5 (a), 8.4 (a) (4), and 9.3 by intentionally making misrepresentations to and abandoning his

client facing criminal charges); *In the Matter of Redwine*, 311 Ga. 287, 288 (857 SE2d193) (2021) (surrender of license, which is tantamount to disbarment, was appropriate sanction for attorney who violated Rules 1.2 (a), 1.3, 1.4 (a), 3.2, 8.4 (a) (4), and 9.3 by abandoning a client's legal matter and failing to respond to the grievance or ensuing notice of investigation); *Arrington*, 308 Ga. at 487 (disbarring attorney who did not respond to disciplinary proceedings and by default admitted to violating Rules 1.3, 1.4, 1.15 (I), and 1.15 (II) (a) by abandoning his client, failing to keep $972.50 in a trust account separate from his own funds, and failing to deliver or account for them upon the client's request); *In the Matter of Butler*, 283 Ga. 250, 251 (657 SE2d 245) (2008) (disbarring attorney who was found in default, although he still engaged in disciplinary process, for violating Rules 1.15 (I) (a), 1.15 (II) (b), 8.1, and 8.4 (a) (4), where attorney failed to return $3,500 retainer and $50,000 that client entrusted to attorney to hold in a trust account; aggravating circumstances included attorney refusing to acknowledge the wrongful nature of his conduct, having a dishonest or selfish motive,

26

being indifferent to making restitution, and obstructing the disciplinary process); *In the Matter of Noriega-Allen*, 308 Ga. 398, 398-399 (841 SE2d 1) (2020) (disbarring attorney, who was in default, based on her violations of Rules 1.2 (a), 1.3, 1.4, 1.5, 1.15 (I), 1.15 (II), 1.16 (d), and 3.2 in receiving retainer to represent client in divorce matter but then abandoning client).

In addition, the State Bar states that while Adams claims that the Special Master showed "bias" and exceeded his authority, Adams did not cite any evidence of this in the record other than the Special Master's revised recommendation of discipline to support that claim. Moreover, the State Bar notes that Adams is attempting to relitigate his default, despite the Court having ruled against him on that issue in its remand order, and while he complains of due process issues, his arguments are not supported by the record. In conclusion, the Bar asserts that the Special Master's amended report reflects "th[is] Court's unqualified interest" in "the importance of protecting the public from attorneys who are not qualified to practice law due to incompetence, and the need for public confidence in the profession."

27

*In the Matter of Brown*, 289 Ga. 912, 914 (717 SE2d 217) (2011). Moreover, the Bar concludes that the Special Master was correct to consider Adams's "fierce refusal to acknowledge any wrongdoing or further obligation to [the client] and how that fit into the larger picture of [Adams] trying to take advantage of his client for his own gain." Accordingly, the State Bar requests that the Court accept the recommendation of disbarment.

4. *Adams's Reply to the State Bar*

Adams replies that the Special Master's amended report erroneously alleges matters that had not yet occurred at the time of the notice of the finding of probable cause; that this matter simply involves a misunderstanding on the part of the client who filed the grievance; and that the imposition of a contingency fee in this matter makes no sense.

5. *This Court's Analysis and Recommendation*

While Adams again challenges the findings of fact in his exceptions and seeks to challenge the Special Master's determination that Adams was in default, this Court already

28

rejected this argument in the remand order, stating that "we do not agree with Adams that the Special Master erred in granting default judgment given Adams's failure to satisfy the requirements of Bar Rules 4-212 (b) and 4-221 (b) and his failure to satisfy the requirements of OCGA § 9-11-55 (b) for opening default." His due process argument also lacks merit. Bar Rule 4-213 (a) provides that "[w]ithin 90 days after . . . the expiration of the time for filing of the answer [i.e., following default] . . . the Special Master shall proceed to hear the case. . . . When the hearing is complete, the Special Master *shall proceed to make findings of fact*, conclusions of law and a recommendation of discipline and file a report with the Clerk of the State Disciplinary Boards as hereinafter provided" (emphasis supplied). Thus, despite Adams's default, the Special Master was permitted to hold an evidentiary hearing and make additional findings of fact after the formal complaint was filed, and, indeed, did so not once, but twice, with this Court stating in the remand order that such a hearing was authorized pursuant to Bar Rule 4-213 (a).

Adams does not actually challenge any of Special Master's

29

conclusions of law, except the Special Master's finding that he violated Rule 1.5 (c) (1). However, the Special Master's conclusion that Adams was representing the client on a contingency fee basis is not clearly erroneous, given that Adams previously represented her in a credit report matter on a contingency fee basis, he had given her no reason to believe that the Trans Union matter would be any different, and he never billed her for the work or gave her any sort of breakdown of the costs associated with the Trans Union representation. Thus, it is likewise not clearly erroneous for the Special Master to conclude that Adams should have explained the rate and basis for a contingency fee in writing. Moreover, we note that Adams does not challenge any of the Special Master's findings regarding the aggravating factors and his mental state, beyond calling the Special Master "bias[ed]." And the cases Adams cites in support of a Review Board reprimand appear distinguishable, in that the attorneys had shown some sort of remorse and exhibited greater participation with the State Bar in resolving those matters.

Nevertheless, we also do not find the cases cited by the Special

30

Master particularly relevant for determining the appropriate level of discipline in this matter. In our remand order, we asked the Special Master to show that his recommendation "is within the range of discipline that this Court has previously imposed in cases involving *similar [Rule] violations and mitigating and aggravating factors*." (Emphasis supplied). However, the Special Master only cited a handful of cases in his discussion of the aggravating factors, primarily focusing on cases in which this Court has disbarred attorneys who have failed to comply with the disciplinary process. He also cross-referenced cases cited in the State Bar's "supplemental brief."[5] However, those cases too appear distinguishable, not only based on the conduct at issue, but in that they all include situations where the attorney failed to engage and *completely disregarded* the disciplinary proceedings. The only exception is *In the Matter of Butler*, but the facts in that case are much more egregious in that the attorney took over $50,000 entrusted to him and used the funds

---

[5] Although the State Bar's supplemental brief does not appear in the record, the cases on which the State Bar relied appear to be the same cases cited in the State Bar's response to the exceptions in this Court.

for his own benefit, never paid the client *any* amount, and failed to actually complete work on behalf of his client. See *Butler*, 283 Ga. at 250-251.

Here, Adams failed to adequately communicate with his client about the $7,000 settlement, charged an unreasonable fee for obtaining the settlement, and failed to keep the settlement money in a separate IOLTA account and maintain proper records of the account. However, unlike Butler, Adams returned some of the settlement money to his client, and he did engage in some of the State Bar proceedings. Accordingly, we disagree with the Special Master and the State Bar that disbarment is warranted in this case. Instead, we conclude that under the particular facts of this case, and given the aggravating and mitigating circumstances, a one-year suspension from the practice of law, with reinstatement conditioned on Adams providing restitution totaling $2,732.81, to his former client, is a sufficient sanction for his conduct in this matter. See *In the Matter of Wright*, 294 Ga. 289 (751 SE2d 817) (2013) (accepting review panel's report and recommendation and imposing one-year

suspension with conditions for attorney's violations of Rule 1.4, 1.5 (c) (2), 1.15 (I) (b) and (c), and 1.15 (II) (b) related to her settlement of client's case, where attorney failed to send settlement statements and retained settlement proceeds; attorney filed exceptions and stated that review panel erred by overlooking facts in the record, by crediting the clients' testimony over hers, by finding a violation of any Bar Rule, and by finding suspension appropriate); *In the Matter of Fitch*, 289 Ga. 253 (710 SE2d 563) (2011) (accepting Special Master's report and recommendation and imposing one-year suspension with conditions for attorney's violations of Rules 1.15 (I) (a), (b), and (c), 1.15 (II) (a) and (b), 1.3, and 1.4 and noting that while attorney never acknowledged the wrongful nature of her conduct or that her actions were inappropriate, "her actions were not theft, but poor practice management, particularly the failure to enter into a clear representation agreement and fee schedule," and that suspensions have been imposed for Rule 1.15 (I) and (II) violations). At the conclusion of the one-year suspension, Adams may seek reinstatement by demonstrating to the State Bar's Office of General

Counsel that he has met the condition on reinstatement. If the State Bar agrees that the condition has been met, it will submit a notice of compliance to this Court, and this Court will issue an order granting or denying reinstatement. Adams is reminded of his duties under Bar Rule 4-219 (b).

*One-year suspension with condition. All the Justices concur.*